789 F.2d 996
 54 USLW 2579, 4 Fed.R.Serv.3d 750, 32
Ed. Law Rep. 50
 In re SCHOOL ASBESTOS LITIGATION.
SCHOOL DISTRICT OF LANCASTER, Manheim Township School
District, Lampeter- Strasburg School District, and
Northeastern School District
v.
LAKE ASBESTOS OF QUEBEC, LTD., the Celotex Corp., Raymark
Industries, Inc., Union Carbide Corp., Asbestospray Corp.,
Sprayo-Flake Co., National Gypsum Co., Sprayed Insulation,
Inc., Asbestos Fibres, Inc., Dana Corp., U.S. Gypsum, U.S.
Mineral Products Co., Sprayon Insulation & Acoustics, Inc.,
Sprayon Research Corp., Keene Corp., Worben Co., Inc.,
Wilkin Insulation Co., W.R. Grace & Co., Owens-Corning
Fiberglas Corp., Standard Insulations, Inc., North American
Asbestos Corp., Cassiar Resources Ltd., Bell Asbestos Mines,
Ltd., Asbestos Corporation Limited, Southern Textile Corp.,
Owens-Illinois, Inc., Turner & Newall Ltd., the Flintkote
Co., Fibreboard Corp., GAF Corp., Uniroyal, Inc., Cape
Asbestos, Pfizer, Inc., Kaiser Cement Corp., Bes-Tex, Inc.,
Georgia- Pacific Corp.
BARNWELL SCHOOL DISTRICT NO. 45
v.
U.S. GYPSUM, National Gypsum Co., W.R. Grace & Co.,
Asbestospray Corp., Sprayo- Flake Co., Sprayed Insulation,
Inc., Asbestos Fibres, Inc., Dana Corp., U.S. Mineral
Products Co., Sprayon Insulation & Acoustics, Inc., Sprayon
Research Corp., Keene Corp., Wilkin Insulation Co., Turner &
Newall Ltd., J.W. Roberts, Ltd., Proko Industries, Inc.,
Raymark Industries, Inc., Owens-Corning Fiberglas Corp.,
Standard Insulations, Inc., Southern Textile Corp.,
Owens-Illinois, Inc., the Flintkote Co., Fibreboard Corp.,
Uniroyal, Inc., Rock Wool Manufacturing Co., Inc., Empire
Ace Insulation Manufacturing Corp., Eagle- Picher
Industries, Inc., Forty-Eight Insulations, Inc., Combustion
Engineering, Inc., GAF Corp., Lac d'Amiante du Quebec,
Ltee., the Celotex Corp., Carey- Canada, Inc., Union Carbide
Corp., Brinco Mining, Ltd., formerly known as Cassiar
Resources, Ltd., Bell Asbestos Mines, Ltd., Asbestos
Corporation Limited, Cape Asbestos, North American Asbestos
Corp., Turner Asbestos Fibres, Ltd., C. Tennant & Sons,
Huxley Development Corp., Asten Group, Inc., H.K. Porter
Co., Nicolet Industries, Armstrong Contracting & Supply
Corp., Benjamin Foster Co., Pittsburgh Corning Corp.,
Armstrong World Industries, Inc., Worben Co., Inc.
Appeal of GAF CORP., Appellant in 84-1642, 85-1272 & 85-1288.
Appeal of LOS ANGELES UNIFIED SCHOOL DISTRICT, Appellant in 84-1643.
Appeal of FIBREBOARD CORP., Appellant in 84-1649.
Appeal of The CELOTEX CORP., and Carey-Canada, Inc.,
Appellants in 84-1651 & 85-1243.
Appeal of NATIONAL GYPSUM CO., U.S. Gypsum Co., and W.R.
Grace & Co., Appellants in 84-1652 & 85-1287.
Appeal of BOARD OF EDUCATION OF CLIFTON, Appellant in 84-1670.
Appeal of LAC d'AMIANTE du QUEBEC, LTEE., Appellant in 84-1671.
Appeal of OWENS-CORNING FIBERGLAS CORP., Appellant in 84-1672.
Appeal of BARNWELL SCHOOL DISTRICT NO. 45, Appellant in 84-1692.
Appeal of BELL ASBESTOS MINES, LTD. and U.S. Mineral
Products Co., Appellants in 84-1693.
Appeal of ASBESTOS CORPORATION LIMITED, Appellant in 84-1694.
Appeal of BOARDS OF EDUCATION OF ANDERSON COUNTY, Johnson
County, Loudon County, Knox County, City of
Knoxville, and Hawkins County,
Tennessee, Appellants in 84-1695.
Appeal of H.K. PORTER CO., Southern Textile Corp., and
Forty-Eight Insulations, Inc., Appellants in 84-1696.
 Nos. 84-1642, 84-1643, 84-1649, 84-1651, 84-1652, 84-1670 to
84-1672, 84-1692 to 84-1696, 85-1243, 85-1272,
85-1287 and 85-1288.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 6, 1986.
Decided May 1, 1986.
As Amended May 30, 1986.
Rehearing and Rehearing In Banc in Nos. 84-1651, 85-1243,
84-1642, 85-1272, 85- 1288, 84-1672, 84-1696,
84-1671, 84-1694, 84-1649, 84-1652,
85-1287 Denied June 2, 1986.
 
 Arthur Miller (argued), Cambridge, Mass., Herbert B. Newberg (argued), Harvey S. Kronfeld, Gerald E. Wallerstein, Philadelphia, Pa., for appellant and class representative Barnwell School Dist. No. 45.
 Edward J. Westbrook, Blatt & Fales, Charleston, S.C., Daniel A. Speights, Hampton, S.C., for appellant and class representative Barnwell School Dist. No. 45 and Spartanburg School Dist. No. 7.
 Michael L. Goldberg (argued), George M. Rosenberg, Charles B. O'Reilly, Aaron H. Simon, Greene, O'Reilly, Broillet, Paul, Simon, McMillan, Wheeler & Rosenberg, Washington, D.C., for Los Angeles Unified School Dist.
 Ralph W. Brenner (argued), Stephen A. Madva, Montgomery, McCracken, Walker & Rhoads, Philadelphia, Pa., for the Celotex Corp. & Carey-Canada, Inc.
 Edward Greer, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for GAF Corp.
 John P. Kelley, Kursen, Evans & Byrne, Philadelphia, Pa., for Owens-Corning Fiberglas Corp.
 Ellen B. Furman, Ominsky, Joseph & Welsh, Philadelphia, Pa., for Asbestos Corp., Ltd.
 Lawrence T. Hoyle, Jr. (argued), Arlene Fickler, Richard M. Bernstein, Hoyle, Morris & Kerr, Philadelphia, Pa., for Nat. Gypsum Co.
 Richard P. Brown, Jr. (argued), Frank L. Corrado, Jr., Morgan, Lewis, & Bockius, Philadelphia, Pa., for U.S. Gypsum Co.
 Shepard M. Remis, Herrick & Smith, Boston, Mass., for W.R. Grace & Co.
 Mike Rowland (argued), Rowland & Rowland, P.C., Knoxville, Tenn., for Boards of Educ. of Anderson County, Johnson County, Loudon County, Knox County, City of Knoxville, and Hawkins County, Tenn.
 Gary Crawford (argued), Yvonne V. Miller, Skadden, Arps, Slate, Meagher & Flom, New York City, for the Flintkote Co.
 Thomas J. Ingersoll, Deasey, Scanlon & Bender, Philadelphia, Pa., for Armstrong World Industries, Inc.
 Edward J. Madeira (argued), Pepper, Hamilton & Scheetz, Philadelphia, Pa., for Lake Asbestos of Quebec, Ltd.
 Patrick C. English, Aron Dines, Dines & English, Clifton, N.J., for Bd. of Educ. of the City of Clifton.
 Thomas M. Keeling, Frederick J. Killion, Bishop, Liberman, Cook, Purcell & Reynolds, Washington, D.C., for amicus curiae Anchorage School Dist.
 Joseph J. Armao, Liebert, Short, Fitzpatrick & Hirshland, Philadelphia, Pa., for Fibreboard Corp.
 Thomas R. Cunningham, White & Williams, Philadelphia, Pa., for H.K. Porter Co. & Southern Textile Corp.
 David Berger (argued), Daniel Berger, Ruthanne Gordon, Sheldon V. Toubman, David Berger Attys. At Law, Philadelphia, Pa., for Class Representatives; Charles Alan Wright, Austin, Tex., of counsel.
 Before WEIS, HIGGINBOTHAM, and BECKER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In an effort to reach an equitable result in these asbestos property damage cases brought by school authorities, the district court certified a nationwide mandatory class for punitive damages and an opt-out class for compensatory damages. We conclude that the mandatory class cannot be approved because of a lack of necessary findings and for the additional reason that the class, being under-inclusive, cannot in the circumstances here accomplish the objectives for which it was created. We will, however, affirm the denial of a (b)(2) class and despite misgivings on manageability, will affirm the district court's conditional certification of a Rule 23(b)(3) opt-out class on compensatory damages.
 
 
 2
 The district court invoked Fed.R.Civ.P. 23(b)(1)(B) in entering the certification order designating a mandatory class for school districts seeking punitive damages and followed Rule 23(b)(3) in forming a class for those seeking compensatory damages. A request for class certification under Rule 23(b)(2) was denied.
 
 
 3
 Pursuant to 28 U.S.C. Sec. 1292(b), the court certified that the order constituting the 23(b)(1)(B) class raised a controlling question of law respecting possible violation of the Anti-Injunction Act, 28 U.S.C. Sec. 2283. Various parties have appealed, challenging not only that phase of the case but also the propriety of the (b)(3) certification as well as the denial of the (b)(2) request.[1]
 
 
 4
 This litigation began with the filing of class action complaints in the Eastern District of Pennsylvania by several Pennsylvania school districts and the Barnwell, South Carolina School District. The cases were consolidated soon after filing. Defendants, numbering approximately fifty, are associated with the asbestos industry as miners, bulk suppliers, brokers, assemblers, manufacturers, distributors, and at least one contractor.
 
 
 5
 As a result of federal legislation and regulation, plaintiffs are required to test for the presence of asbestos in schools.[2] The complaints seek compensatory and punitive damages as well as injunctive relief stemming from compliance with the federal legislation and the alleged need to remove or treat materials containing asbestos. The claims are based on theories of negligence, strict liability, intentional tort, breach of warranty, concert of action, and civil conspiracy.
 
 
 6
 After a group of plaintiffs presented a motion for the formation of classes under section (b)(1) and (b)(2) of Rule 23, the court issued an order certifying such classes but limited them to claims against three defendants which had agreed not to oppose that action. This ruling led to objections by various other plaintiffs and defendants, and the court later vacated the order in part. Arguments were then heard from all parties who split, not along the usual plaintiff-defendant lines, but into a number of unusual alignments as dictated by their perceived interests. The eventual certification order included the claims against all defendants.
 
 
 7
 In conditionally creating a mandatory class under (b)(1)(B) on the punitive damage claims, the court found "a substantial possibility that early awards of punitive damages in individual cases [would] impair or impede the ability of future claimants to obtain punitive damages." In re Asbestos School Litigation, 104 F.R.D. 422, 437 (E.D.Pa.1984). Although plaintiffs had advanced the argument that the defendants' funds would be exhausted before all claimants were paid, no substantive evidence was presented demonstrating that those assets would be insufficient, and accordingly the district judge declined to address that issue. Id. at 434 n. 15.
 
 
 8
 The court believed that a mandatory class would create an opportunity for parity of treatment by bringing all injured parties into the same forum. Nevertheless, any plaintiff who opted out of the (b)(3) class would be permitted to settle a punitive damage claim with defendants. Additional support for certification was found in the strong "federal interest inherent in asbestos abatement" and the minimal intrusion on the interests of the school districts.
 
 
 9
 Class certification under 23(b)(2), however, was denied. The court commented that "despite the ingenuity of plaintiffs' claims for limited equitable remedies, this case remains at bottom, one for legal damages." 104 F.R.D. at 438. Although recognizing the possibility that at some point there might be "an incidental need for equitable relief," the court concluded that such a potential could not sustain certification under 23(b)(2).
 
 
 10
 The court directed the certification of a 23(b)(3) class, finding the numerosity requirement satisfied by estimates that friable asbestos is present in approximately 14,000 of the nation's schools, about 8,500 of which have an abatement problem. Commonality existed in an underlying core of issues identified as:
 
 
 11
 "(a) The general health hazards of asbestos;
 
 
 12
 (b) defendants' knowledge or reason to know of the health hazards of asbestos;
 
 
 13
 (c) defendants' failure to warn/test; and
 
 
 14
 (d) defendant's concert of action and/or conspiracy involving formation of and adherence to industry practices."
 
 
 15
 104 F.R.D. at 429. Those elements could "be established by common proof, which, although it may be complex, does not vary from class-member school to class-member school."
 
 
 16
 The typicality requirement was satisfied because the plaintiffs' theories of liability were harmonious, and the named plaintiffs stood in a position similar to other members of the class. Some of the parties had obliquely questioned the adequacy of representation, but the court concluded that the class was represented by counsel "very experienced with class action litigation and thoroughly familiar with property damage and mass disaster litigation."
 
 
 17
 In considering the specific requirements for a (b)(3) certification, the court noted that the presence of asbestos in school buildings had a similar impact on each member of the class. Additionally, the question of proximate cause was a legal one which could be resolved on a class-wide basis without involving individualized member-by-member proof.
 
 
 18
 Addressing the requirement of superiority, the court emphasized that in resolving "at least some of the issues" on a class basis potential savings in expense would result, a consideration particularly important in asbestos litigation with its staggering costs. Moreover, because all claims were for property damage, the level of concern for the plaintiffs' right to choose individual forums and counsel was reduced.
 
 
 19
 The district judge conceded that the manageability aspect was not "wholly without difficulty," but stated "at this point I believe the management problems can be overcome." The court was convinced that although the substantive tort law of many jurisdictions might be applicable, the basic variations could be reduced to a reasonable number and subclasses could be created to accommodate those differences. Furthermore, plaintiffs represented to the trial judge that they would "direct discovery and trial briefs to meet the most stringent test of liability."
 
 
 20
 Notwithstanding the difficulties, the court determined that the class action was superior to the only existing alternative--repetitious individual litigation.
 
 I.
 
 21
 This appeal must be decided against the background of the asbestos scene, an unparalleled situation in American tort law. To date, more than 30,000 personal injury claims have been filed against asbestos manufacturers and producers. An estimated 180,000 additional claims of this type will be on court dockets by the year 2010. Added to those monumental figures are the claims for property damage--the cost of removing or treating asbestos-based materials used in building construction. Some indication of the magnitude of that potential liability may be gleaned from the fact that the property damage claims filed in the Johns-Manville bankruptcy proceedings stood at $69 billion as of June 1985.
 
 
 22
 The procedures of the traditional tort system proved effective in unearthing the hazards of asbestos to workers and the failure of its producers to reduce the risk. However, the undeniable limitations of the "one-on-one" approach in coping with the massive onset of claims now in the courts have caused serious and justified concern.
 
 
 23
 A report compiled by the Rand Corporation, entitled Asbestos in the Court (1985), paints a gloomy picture. It points out the high cost and inefficiencies in handling these individual claims as well as the uneven, inconsistent, and unjust results often achieved. Perhaps the least flattering statistic is the high cost of processing these claims: "On the average, the total cost to plaintiffs and defendants of litigating a claim was considerably greater than the amount paid in compensation." Report at page 1.
 
 
 24
 Inefficiency results primarily from relitigation of the same basic issues in case after case. Since a different jury is empaneled in each action, it must hear the same evidence that was presented in previous trials. A clearer example of reinventing the wheel thousands of times is hard to imagine.
 
 
 25
 Apparent inconsistency of jury verdicts has often been a reflection of the ability of the system to sort out individual differences and tailor redress to precise circumstances. In the asbestos litigation field, however, the variation in jury awards has led to complaints that injustice rather than careful apportionment has resulted.
 
 
 26
 A Philadelphia Common Pleas Judge is quoted in the Rand Report:
 
 
 27
 "Results of jury verdicts are capricious and uncertain. Sick people and people who died a terrible death from asbestos are being turned away from the courts, while people with minimal injuries who may never suffer severe asbestos disease are being awarded hundreds of thousands of dollars, and even in excess of a million dollars. The asbestos litigation often resembles the casinos 60 miles east of Philadelphia, more than a courtroom procedure."[3]
 
 
 28
 The problems are complicated by the variations and permutations of state law that govern tort liability. Most jurisdictions have continued, perhaps understandably, to treat the problem in a parochial and nearsighted manner. It may be that a state court does not wish to deny its litigants the benefits that are available in other jurisdictions. An attempt by a single state to impose some equitable form of apportionment to claims presently pending and to those inevitably arising in the future is discouraged because other jurisdictions are not required to adopt a similarly enlightened viewpoint. A forum wishing to take the long-range view might find that its efforts were not only ineffective but unfair to its citizenry because claimants in the other states could drain off all the assets available for satisfaction of claims.
 
 
 29
 The national dimensions of the problem have led to calls for congressional action. Although the subject has attracted the attention of individual representatives and senators, no legislative response has garnered enough support to be enacted. Frustrated by the seemingly intractable problems inherent in the present situation, a thoughtful minority of the Court of Appeals of the Fifth Circuit would have certified to the United States Supreme Court the question of whether federal common law can apply to asbestos litigation. See Jackson v. Johns-Manville Sales Corp., 750 F.2d 1314 (5th Cir.1985) (in banc), on rehearing, 781 F.2d 394 (5th Cir.1986) (The original in banc majority certified certain questions to the state supreme court, which declined to rule on them).
 
 
 30
 Although necessarily brief, this sketch of the background of asbestos litigation is enough to show that this is not a routine class action.
 
 II.
 
 31
 Our first issue is appellate jurisdiction over the various questions presented. We have articulated a policy against freely accepting appeals from class certification orders where the action is grounded in the discretionary power of the district court. Link v. Mercedes-Benz, Inc., 550 F.2d 860, 862 (3d Cir.1977). To qualify for interlocutory review, a class certification decision must implicate special factors that take it outside the general rule. Kramer v. Scientific Control Corp., 534 F.2d 1085, 1087 (3d Cir.1976); Katz v. Carte Blanche Corp., 496 F.2d 747 (3d Cir.), cert. denied, 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974).
 
 
 32
 We have no doubt that the question submitted under Sec. 1292(b), focusing on the applicability of the Anti-Injunction Act to the mandatory class action under Rule 23(b)(1)(B), presents such an exception. Review of that issue also necessarily calls into consideration the propriety of class certification vel non.[4]
 
 
 33
 The power under Sec. 1292(b) to review the district court's decisions on the Rule 23(b)(2) and (b)(3) matters is not as clearly defined. In Murphy v. Heppenstall Co., 635 F.2d 233, 235 n. 1 (3d Cir.1980), we said, "On a Section 1292(b) appeal we consider all grounds which might require a reversal of the order appealed from." See also Johnson v. Alldredge, 488 F.2d 820 (3d Cir.1973), cert. denied sub nom, Conrath v. Johnson, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974).
 
 
 34
 Here the district judge incorporated all of his rulings on the three class action certification requests into one order. Even if that were not enough to give us appellate jurisdiction over the Rule 23(b)(2) and (b)(3) issues, we conclude that because so many of the factors relevant to the (b)(1)(B) class are also crucial to the (b)(2) and (b)(3) certifications, resolving some of the questions now while reserving the others until after final judgment would be neither practicable nor desirable.[5]
 
 
 35
 Accordingly, we conclude that we have jurisdiction to consider all facets of the class certification order.
 
 III.
 THE 23(b)(1)(B) CERTIFICATION
 
 36
 All class actions must meet the prerequisites of Rule 23(a): numerosity, existence of questions of law or fact common to the class, typicality of claims or defenses, and adequacy of representation. Assuming the existence of these factors for present purposes, we proceed to the special elements of the (b)(1)(B) class, mindful that the most significant aspect of such a class is its mandatory character. All those who come within the description in the certification become, and must remain, members of the class because no opt-out provision exists.
 
 
 37
 In a diversity action such as this, certification of a mandatory class raises serious questions of personal jurisdiction and intrusion into the autonomous operation of state judicial systems. Another complicating factor is the Anti-Injunction Act, 28 U.S.C. Sec. 2283, which prohibits a federal court from enjoining proceedings in a state court except with express Congressional authorization "or where necessary in aid of its jurisdiction or to protect or effectuate its judgment." By contrast, inclusion of the opt-out provision in 23(b)(3) class actions removes many of the problems raised by a mandatory procedure. Use of a voluntary class assures that only willing plaintiffs are before the court.
 
 
 38
 Rule 23(b)(1)(B) applies where there is a risk that "adjudications with respect to individual members of the class ... would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests."
 
 
 39
 Because plaintiffs had presented no evidence that the defendants' available assets would be insufficient to pay all claims, the district court did not rely on a "limited fund" theory as a basis for class certification. The proponents of the mandatory class, however, asserted "the very real possibility" that late-coming plaintiffs would be unable to receive punitive damages if a court decided in the future that defendants had been punished enough. In short, at some point punitive damages might be prohibited because they would amount to overkill, a proposition advanced in Roginsky v. Richardson-Merrell, Inc., 378 F.2d 832, 839 (2d Cir.1967). Finding a "substantial possibility" of the overkill scenario, the district court determined that creation of a (b)(1)(B) class was warranted as a measure to promote "equality of treatment for all litigants."
 
 
 40
 The demands for punitive damages have propelled this action into the controversy over awarding exemplary damages in successive mass tort cases arising from the same wrongful act. Problems in this area have been created by the failure of some courts to recognize the reasons underlying punitive damages.
 
 
 41
 Exemplary damages are said to date back to the Code of Hammurabi of 2000 B.C. See Owen, Problems in Assessing Punitive Damages Against Manufacturers of Defective Products, 49 U.Chi.L.Rev. 1, 10 (1982).[6] In a 1763 case, Huckle v. Money, 2 Will.K.B. 206, 95 Eng.Rep. 768, the court approved a punitive damage verdict where the the small size of the actual loss resulting from an illegal entry justified the jury verdict in excess of that amount. See Roginsky v. Richardson-Merrell, Inc., 378 F.2d at 836. Since then punitive awards have generally been available when the defendant's conduct was either intentional or so reckless as to be considered outrageous.
 
 
 42
 In this country, most jurisdictions have adopted the doctrine in one form or another. The Restatement (Second) of Torts Sec. 908 and the majority of states endorse exemplary damages for punishment and deterrence. As such, these awards act almost as a form of criminal penalty administered in a civil court at the request of a plaintiff who serves somewhat as a private attorney general.
 
 
 43
 Consistent with this scheme, punitive damages form no part of the compensatory award--in theory the plaintiff's losses are fully redressed before consideration is given to exemplary damages.[7] Because the intent is to inflict punishment on a culpable defendant, in many jurisdictions insurance against such awards is contrary to public policy. Compare Northwestern Nat'l. Cas. Co. v. McNulty, 307 F.2d 432 (5th Cir.1962), with Lazenby v. Universal Underwriters Ins. Co., 383 S.W.2d 1 (Tenn.1964). See Ghiardi & Kircher, Punitive Damages Law & Practice, Sec. 6.11 (1984). Cf. Shaumaier & McKinsey, The Insurability of Punitive Damages, 72 A.B.A.J. 68 (1986).
 
 
 44
 In the era when most tort suits were "one-against-one" contests, a single act triggered a single punishment. The increasingly prevalent mass tort situation, however, exposes a defendant to repetitious punishment for the same culpable conduct. The parallels between the assessment of exemplary damages and a fine levied in criminal courts have led to suggestions that the concepts of double jeopardy and excessive punishment should be invoked in the civil field as well. See Aetna Life Ins. Co. v. Lavoie, 46 C.C.H.S.Ct.Bull.P. B1945 (Apr. 22, 1986); see also Morris, Punitive Damages in Tort Cases, 44 Harv.L.Rev. 1173 (1931); cf. Comment, Criminal Safeguards and the Punitive Damages Defendant, 34 U.Chi.L.Rev. 408 (1967).
 
 
 45
 Similar concerns have prompted highly respected judges to comment on the possibility that the due process clause might contain some constitutional limitation on the amount of exemplary damages to be awarded. "Unlimited multiple punishment for the same act determined in a succession of individual lawsuits and bearing no relation to the defendants' culpability or the actual injuries suffered by victims, would violate the sense of 'fundamental fairness' that is essential to constitutional due process." In re Federal Skywalk Cases, 680 F.2d 1175, 1188 (8th Cir.1982) (Heaney, J. dissenting). "There must, therefore, be some limit, either as a matter of policy or as a matter of due process, to the amount of times defendants may be punished for a single transaction." In re "Agent Orange" Product Liability Litigation, 100 F.R.D. 718, 728 (1983).
 
 
 46
 In addition to a possible federal constitutional limitation, state substantive tort law could place restraints on repetitive punitive damage awards. This concept, aimed at the prevention of "overkill" as discussed in Roginsky, has been labeled the "limited generosity" theory by some of the parties to this case.
 
 
 47
 In Roginsky, Judge Friendly speculated on the possibility of having one court assess a single punitive damage award for distribution to all successful plaintiffs. 378 F.2d at 839 n. 11. See also Seltzer, Punitive Damages in Mass Tort Litigation: Addressing the Problems of Fairness, Efficiency and Control, 52 Fordham L.Rev. 37 (1983). The district court's (b)(1)(B) certification in this case is a variation on that same theme.
 
 
 48
 In a thoughtful dissertation prepared in the course of the LL.M. program for judges conducted at the University of Virginia Law School, Judge R. Barclay Surrick thoroughly reviewed the doctrine of punitive damages. He concluded that in the field of asbestos litigation, "[b]alancing the benefits to be derived from continued imposition of punitive damages against the social and economic consequences of such a course of action, it appears that the continued imposition of punitive damages cannot be justified." Surrick, Punitive Damages and Asbestos Litigation in Pennsylvania: Punishment or Annihilation?, 87 Dick.L.Rev. 265, 296 (1983).
 
 
 49
 Cognizant of these concerns, two federal courts of appeals have nevertheless allowed awards of punitive damages in asbestos cases on the ground that they were permitted by state law. Jackson v. Johns-Manville, 781 F.2d 394 (5th Cir.1986); Cathey v. Johns-Manville Sales Corp., 776 F.2d 1565 (6th Cir.1985). In the latter case, the court rejected the defendant's due process contention, stating that "As a matter of federal constitutional law we believe that the presence of a judicial tribunal before which to litigate the propriety of a punitive damages award provides Johns-Manville with all the procedural safeguards to which it is due." 776 F.2d at 1571.
 
 
 50
 Cathey treated the defendant's argument on punitive damages as raising only a procedural due process issue. But the concerns recited by a number of courts and commentators are centered on the substantive component of due process. Cf. Daniels v. Williams, --- U.S. ----, ----, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring) (Substantive due process "prohibits a State from taking certain action[s] 'regardless of the fairness of the procedures used to implement them.' ").
 
 
 51
 Thus powerful arguments have been made that, as a matter of constitutional law or of substantive tort law, the courts shoulder some responsibility for preventing repeated awards of punitive damages for the same acts or series of acts. Preliminarily we will assume, without deciding, that these arguments might provide a threshold justification for the exercise of discretion in certifying a nationwide (mandatory) Rule 23(b)(1)(B) class for punitive damages. We nonetheless hold that the district court abused its discretion in certifying the 23(b)(1)(B) class here because neither the record nor the court's findings are adequate to support the procedure.
 
 
 52
 The district court made no factual findings at all as to the potential amount and scope of punitive damages. This is in sharp contrast to the detailed findings on the subject in In re Agent Orange Product Liability Litigation, 100 F.R.D. 718 (E.D.N.Y.1983), mandamus denied, 725 F.2d 858 (2d Cir.), cert. denied, 465 U.S. 1067, 104 S.Ct. 1417, 79 L.Ed.2d 743 (1984). The most the district court mustered here was its conclusion that:
 
 
 53
 It is apparent that there is a substantial possibility that early awards of punitive damages in individual cases will impair or impede the ability of future claimants to obtain punitive damages. The reality of such impairment has been recognized by commentators and courts. (citations omitted).
 
 
 54
 104 F.R.D. at 437.
 
 
 55
 We are aware of the inherent limitations on any factual inquiry undertaken at such an early stage of the litigation, and we recognize that any record that could be developed would be inevitably predictive. Nonetheless, in our view these findings fall short of the mark.
 
 
 56
 Moreover, some basic considerations expose a critical flaw in the district court's analysis. The class certified does not even include all property damage claimants. Claims for repair of municipal buildings, for instance, are omitted, as are those of homeowners. Within a few weeks after oral argument in this appeal, a jury awarded $6 million in a property damage case brought as a result of the presence of asbestos products in a city hall. Added to the recovery was $2 million in punitive damages. City of Greenville v. W.R. Grace & Co., No. 6:85-1693-3 (D.S.C.).
 
 
 57
 There is some evidence that the school claims make up a significant portion of the total property damage alleged. See Asbestos Litigation Reporter at 10,243-44 (June 21, 1985). Clearly, however, this aspect of the litigation transcends the nation's classrooms and extends to municipal buildings, homes, and other structures.
 
 
 58
 Far more significant are the tens of thousands of personal injury suits in which punitive damage verdicts have been and continue to be assessed. These claims are satisfied from the same pool of assets to which the school districts now look. If a limit is ever placed on the total punitive damages to be imposed on the asbestos defendants, then that limit probably would apply to all claims whether they arise in property damage or personal injury suits. The school claims would be but a small portion of this total.
 
 
 59
 The circumstances in this case are again a decided contrast to those in the "Agent Orange" litigation where all of the claims against the defendants were concentrated in one case. In that circumstance, the court had control over all those affected and could hope to carry out the basic premise justifying the class action--parity for all victims and reduction of litigation expenses for all parties.
 
 
 60
 Assuming that the record supported the "limited generosity" theory, we would nonetheless decertify the class on the ground that it is under-inclusive. The "limited generosity" theory is a variation of the "limited fund" situation mentioned in the advisory committee note to Rule 23, the situation in which "claims are made by numerous persons against a fund insufficient to satisfy all claims." Fed.R.Civ.P. 23 advisory committee note. More precisely, "limited generosity" (or "punitive damages overkill," as some class members call it) is the functional equivalent of the limited fund in that, by operation of the limited generosity principle, only a limited amount of punitive damage funds will be available, regardless of the ability of the defendants to pay. Since the purpose of a 23(b)(1)(B) class is to avoid a judgment that "while not technically concluding the other members, might do so as a practical matter," id., all persons with claims upon the "limited fund" should be included in the 23(b)(1)(B) class.
 
 
 61
 Thus, because all awards must come from the same defendants, a mandatory class predicated on a potential legal limit to punitive damages would logically include all litigants who seek such awards. From that standpoint, the (b)(1)(B) class certified here is under-inclusive with the result that separate actions by those who should properly be included in the class will go forward. However, the suppression of such separate actions is described in the advisory committee note as "the [reason] for and the principal key to the propriety and value" of a 23(b)(1) class.
 
 
 62
 The committee notes further illuminate the problem of under-inclusiveness in this context by reference to Rule 19: "The considerations stated under clauses (A) and (B) are comparable to certain of the elements which define the persons whose joinder in an action is desirable as stated in Rule 19(a)." Rule 19 describes the procedure for "Joinder of Persons Needed for a Just Adjudication." Section (b) of that Rule provides that a suit should be dismissed when joinder of a party is impossible, and the court determines that "in equity and good conscience the action" should not continue.
 
 
 63
 The considerations mentioned in Rule 19 counsel against maintenance of this mandatory class action in the absence of the other punitive damage claimants.[8] The primary factor lies in the prejudice "to those already parties" to this action.
 
 
 64
 The effect of the mandatory class has been to single out the school districts for special and possibly disadvantageous treatment. They have been forced to litigate in a jurisdiction and under a class procedure that many districts do not desire, and their punitive damage claims have been put "on hold" while the protracted class certification procedure runs its course.[9] Because of this delay, this class could end up in a detrimental position if punitive damage awards are precluded because of a future judicial ruling.
 
 
 65
 Since the thousands of other claimants who seek exemplary damages from the asbestos defendants need not operate within the confines of a mandatory class procedure, the quest for punitive damages remains for them a race to the courthouse door. Consequently, if the district court proves correct in its theory that at some point a limit on all punitive damage awards will be established, the school districts may be prejudiced in their opportunity to share in the available funds in the meantime.
 
 
 66
 As noted by the district court, Rule 23(b)(1)(B) exists to protect potential claimants and provide equality of treatment. Certification of a punitive damage class under that provision here will not accomplish these objectives. In the court's pursuit of an end that is not attainable, the class designed to be protected will be burdened with hardships not imposed on any other litigants.
 
 
 67
 Nor do we see how, in the present posture of this litigation, the class could be expanded to confront effectively the punitive damage issue in the entire asbestos area. Whether a national class based on a federal constitutional challenge could accomplish that result is obviously not before us. Although we recognize and commend the district judge's attempt to grapple with the seemingly insoluble problems of punitive damages in these cases, we simply cannot find that the avenue he selected will lead to an appropriate and fair resolution.
 
 
 68
 We do not hold that under-inclusiveness is necessarily fatal to a class created under 23(b)(1)(B);[10] rather, each case requires a careful assessment of the factors mentioned in Rule 19. Courts should give particular attention to the possibility of prejudice either to those omitted from the class or to those within it. In the circumstances here, we conclude that under-inclusiveness does pose an obstacle.
 
 
 69
 A certain inherent prejudice exists when a litigant is forced to participate in an undesired mandatory class action. That result may be acceptable where the class device will serve the worthwhile goal of protecting the interests of all litigants to a potentially limited fund, but is hard to justify where only a small number of potential claimants can be included in the mandatory action.
 
 
 70
 A class action may promote efficiency by reducing repetitive testimony and evidence that otherwise would be required in individual trials. Those advantages, however, are secured at the price of delaying the disposition of individual cases that might be tried to conclusion in a number of state and district courts in the interim. In effect, a mandatory class action creates a bottleneck by concentrating the litigation, at least for a period, before one judge instead of spreading the individual cases out among many trial forums.
 
 
 71
 The "limited generosity" theory poses yet another concern. Because that concept is based on state law, the lack of uniformity creates difficulties in this diversity case. Federal courts are bound by the constraints of Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1948), and the dictates of state law may not be buried under the vast expanse of a federal class action. The parties' rights under state substantive law must be respected, and if that is not possible in a class action, then that procedure may not be used.
 
 
 72
 It follows that if we cannot make a reasonable prediction that state courts will uniformly accept the limited generosity theory, a class may not be certified with that concept as its underlying justification.
 
 
 73
 No state has yet held that the goals of punishment and deterrence have been met in asbestos cases, nor has the availability of further punitive damages been significantly restricted. As noted earlier, parochial considerations would tend to discourage individual states from eliminating punitive damages in the absence of similar rulings by the others. Nor even if such a movement gets under way is it likely that most states would implement the concept within a reasonably contemporaneous period.
 
 
 74
 Nothing in the record supports the expectation that a substantial number of states will adopt the limited generosity theory in the foreseeable life of this class action. We are aware of the growing sentiment to have state legislatures revise existing tort law. But despite strong arguments favoring limitations on punitive damages and the increasing number of bankruptcies, the "business as usual" attitude still prevails. See, e.g., Jackson v. Johns-Manville; Cathey v. Johns-Manville; Moran v. Johns-Manville Corp., 691 F.2d 811 (6th Cir.1982); Martin v. Johns-Manville Corp., 322 Pa.Super. 348, 469 A.2d 655, (1983); Johns-Manville Sales Corp. v. Janssens, 463 So.2d 242 (Fla.App.1984), petition for review denied, 467 So.2d 999 (Fla.1985). A mandatory class should not be certified on the basis of a prospect so questionable at this time. The record before us is simply inadequate to support a (b)(1)(B) certification on a limited generosity theory.
 
 
 75
 Opponents of the mandatory class have also argued that its use here would be inconsistent with the due process considerations discussed in Phillips Petroleum Co. v. Shutts, --- U.S. ----, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), and would violate 28 U.S.C. Sec. 2283. See In re Federal Skywalk Cases, 680 F.2d 1175 (8th Cir.1982). Our resolution makes consideration of those issues unnecessary. Following the lead of the courts in In Re Bendectin Products Liability Litigation, 749 F.2d 300, 306 (6th Cir.1984), and Dalkon Shield IUD Products Liability Litigation, 693 F.2d 847, 852 (9th Cir.1982), we hold open the possibility of a 23(b)(1)(B) punitive damage class in more appropriate circumstances.
 
 IV.
 DENIAL OF 23(b)(2) CERTIFICATION
 
 76
 A class may be certified under 23(b)(2) when the "party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Plaintiffs here seek mandatory injunctive relief in the form of certain remedial action and restitution for expenditures already incurred to ameliorate asbestos hazards.
 
 
 77
 The district court concluded that despite the plaintiffs' ingenuity the claims in this suit were essentially for damages. The judge pointed to the advisory committee notes accompanying Rule 23(b)(2), which state that it "does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages." The district court did not rule out the possible application of equitable remedies at some stage of the proceeding but concluded that a (b)(2) certification was not appropriate at this time.
 
 
 78
 Precedent supports the district court's view that an action for money damages may not be maintained as a Rule 23(b)(2) class action. See, e.g., Lukenas v. Bryce's Mountain Resort, Inc., 538 F.2d 594 (4th Cir.1976); In re Arthur Treacher's Franchise Litigation, 93 F.R.D. 590, 594 (E.D.Pa.1982). We see no justification for overturning the district judge's evaluation of the realities of the litigation before him. Counsel's desire to have a mandatory class is understandable, but the case for such a certification has not been established.
 
 
 79
 We find neither error of law nor abuse of discretion in the judge's ruling, and consequently will affirm the denial of a (b)(2) class.
 
 V.
 THE 23(b)(3) CERTIFICATION
 
 80
 The advisory committee notes to (b)(3) state that a "mass accident" causing injuries to numerous persons is generally not appropriate for class action treatment because "significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways." If such an action were conducted as a class action, it "would degenerate in practice into multiple lawsuits separately tried."
 
 
 81
 Although that statement continues to be repeated in case law, there is growing acceptance of the notion that some mass accident situations may be good candidates for class action treatment. An airplane crash, for instance, would present the same liability questions for each passenger, although the damages would depend on individual circumstances. Determination of the liability issues in one suit may represent a substantial savings in time and resources. Even if the action thereafter "degenerates" into a series of individual damage suits, the result nevertheless works an improvement over the situation in which the same separate suits require adjudication on liability using the same evidence over and over again. See Hernandez v. Motor Vessel Skyward, 61 F.R.D. 558 (S.D.Fla.1973).
 
 
 82
 Reassessment of the utility of the class action in the mass tort area has come about, no doubt, because courts have realized that such an action need not resolve all issues in the litigation. See Fed.R.Civ.P. 23(c)(4)(A). If economies can be achieved by use of the class device, then its application must be given serious and sympathetic consideration.
 
 
 83
 Concentration of individual damage suits in one forum can lead to formidable problems, but the realities of litigation should not be overlooked in theoretical musings. Most tort cases settle, and the preliminary maneuverings in litigation today are designed as much, if not more, for settlement purposes than for trial. Settlements of class actions often result in savings for all concerned.
 
 
 84
 Part of the reluctance to apply the class action to mass torts is rooted in the notion that individual plaintiffs have the right to select their own counsel and forum, particularly in personal injury actions. See Dalkon Shield IUD Products Liability Litigation, 693 F.2d 847 (9th Cir.1982); Yandle v. PPG Indus., Inc., 65 F.R.D. 566 (E.D.Tex.1974). That factor has little, if any, relevance in this case because the claims are limited to property damage, and school districts are unlikely to have strong emotional ties to the litigation. See In re Three Mile Island Litigation, 87 F.R.D. 433 (M.D.Pa.1980) (certifying class action as to economic claims but not for personal injuries). Furthermore, the school districts have the right to opt out, and some have stated their intention to do so.
 
 
 85
 In short, the trend has been for courts to be more receptive to use of the class action in mass tort litigation. See Wright & Colussi, The Successful Use of the Class Action Device in the Management of the Skywalk Tort Litigation, 52 U.M.K.C.L.Rev. 141 (1984); Williams, Mass Tort Class Actions: Going, Going, Gone? 98 F.R.D. 323; Wright & Miller, Federal Practice and Procedure, Sec. 1783; Note, Class Certification in Mass Accident Cases Under Rule 23(b)(1), 96 Harv.L.Rev. 114 (1983).
 
 
 86
 In reviewing the district court's (b)(3) certification, we must decide whether the criteria of Rule 23(a) are met. The requirements of numerosity, typicality, and adequacy of representation were found to be satisfied in this case, and we affirm those determinations on the basis of the district court's analysis. The only serious challenge raised to the 23(a) ruling is the argument that no "questions of law or fact common to the class" exist. See Rule 23(a)(2). Addressing that contention, we examine the district court's identification of the common issues involved in the plaintiffs' claims. Bogosian v. Gulf Oil Co., 561 F.2d 434 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). If the district court applied the correct legal standard, its class action determination is subject to review for abuse of discretion. 561 F.2d at 448; Katz v. Carte Blanche Corp., 496 F.2d 747, 756-57 (3d Cir.1974) (in banc).
 
 
 87
 Noting that the complaints allege claims for damages based on negligence, strict liability, breach of warranty, intentional tort, concert of action and civil conspiracy, the district court explained that all these claims "arise out of the same common nucleus of operative facts relating to defendants' conduct and the nature of asbestos products." 104 F.R.D. at 432.
 
 
 88
 The district judge identified common factual issues as the health hazards of asbestos, the defendants' knowledge of those dangers, the failure to warn or test, and the defendants' concert of action or conspiracy in the formation of and adherence to industry practices. The court also believed that the proof of these matters would not vary widely from one class member to another. While harboring some reservations as to the breadth of the district court's analysis, we agree with its determination that Rule 23(a)(2) is satisfied.
 
 
 89
 Plaintiffs aver that low-level exposure to asbestos constitutes an excessive risk of harm, and that the presence of ambient fibers requires expensive remedial action to comply with federal legislation and regulations. Plaintiffs contend that the presence of any airborne asbestos fibers in a school presents an unacceptable hazard. Whether that is true or whether only a higher concentration creates a danger is an issue common to all members of the plaintiff class. Ascertaining the danger point is critical to the determination of whether class members have sustained a legal injury and also is pertinent in establishing the existence of a defective product.
 
 
 90
 The plaintiffs' contention that defendants knew of the dangers of asbestos and failed to warn is also common to the members of the class. The opponents assert that the defendants' knowledge cannot be proved on a common basis because medical understanding of the effects of asbestos exposure has "changed markedly" over the years. The focus, however, must be on whether the fact to be proved is common to the members of the class, not whether it is common to all the defendants. See Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975).
 
 
 91
 Similarly, proof of concert of action or conspiracy by the defendants (or some of them) involves common questions.
 
 
 92
 We find ourselves in substantial agreement with the reasoning of the Court of Appeals for the Fifth Circuit which, in upholding a (b)(3) class action of 893 asbestos personal injury claims, noted that the "threshold of commonality is not high." Jenkins v. Raymark Indus. Inc., 782 F.2d 468 (5th Cir.1986).
 
 
 93
 Once the mandates of Rule 23(a) are satisfied, certification may be upheld when common issues predominate over individual ones and the class method of adjudication is superior to existing alternatives. There may be cases in which class resolution of one issue or a small group of them will so advance the litigation that they may fairly be said to predominate. Resolution of common issues need not guarantee a conclusive finding on liability, Eisenberg v. Gagnon, 766 F.2d 770 (3d Cir.1985), nor is it a disqualification that damages must be assessed on an individual basis. See Bogosian, 561 F.2d at 456.
 
 
 94
 Experience shows that in the asbestos litigation arena redundant evidence is the rule rather than the exception. In case after case, the health issues, the question of injury causation, and the knowledge of the defendants are explored, often by the same witnesses. Efforts to achieve expeditious disposition of the cases by invocation of stare decisis and collateral estoppel have been largely unsuccessful. See Hardy v. Johns-Manville Sales Corp., 681 F.2d 334 (5th Cir.1982); Migues v. Fibreboard Corp., 662 F.2d 1182 (5th Cir.1982).
 
 
 95
 The use of the class action device appears to offer some hope of reducing the expenditure of time and money needed to resolve the common issues which are of substantial importance. As the Jenkins court commented, "It is difficult to imagine that class jury findings on the class questions will not significantly advance the resolution of the underlying hundreds of cases." 782 F.2d at 472-73.
 
 
 96
 In some ways, Jenkins presented more difficult problems because of the complexity of the causation questions in personal injury suits; that phase of a property damage claim is more straightforward. However, the Jenkins class action is confined to claims arising under the law of a single state. Here the court is confronted with the substantive law of many states.
 
 
 97
 To meet the problem of diversity in applicable state law, class plaintiffs have undertaken an extensive analysis of the variances in products liability among the jurisdictions. That review separates the law into four categories. Even assuming additional permutations and combinations, plaintiffs have made a creditable showing, which apparently satisfied the district court, that class certification does not present insuperable obstacles. Although we have some doubt on this score, the effort may nonetheless prove successful.[11]
 
 
 98
 We have cited only a few illustrations and have not attempted to compile a complete listing of the practical problems in this case. Some of these difficulties have already been alluded to in the order of the multi-district panel refusing to consolidate pretrial activity in some twenty school district cases. See In re Asbestos School Products Liability Litigation, 606 F.Supp. 713 (J.P.M.L.1985).
 
 
 99
 As we see it, at the present stage, manageability is a serious concern. In a sense, a whole industry is on trial, presenting a likelihood that defendants occupying various positions in the distribution chain could bear differing degrees of responsibility for the alleged injury to the class. For example, two of the common questions are the defendants' knowledge of the dangers of asbestos and the existence of an industry-wide conspiracy to suppress that knowledge. Although the plaintiffs' proof on those points would not differ from class member to class member, certain defendants may respond on an individual basis as to their lack of culpability. The potential for individualized defenses does not detract from the commonality of the questions as viewed from the standpoint of the class members, but the problem clearly poses significant case management concerns.
 
 
 100
 Manageability is a practical problem, one with which a district court generally has a greater degree of expertise and familiarity than does an appellate court. Link v. Mercedes-Benz, Inc., 550 F.2d at 864. Hence, a district court must necessarily enjoy wide discretion, and we are not inclined to reverse a certification before the district judge has had an opportunity to put the matter to a test. We point out the critical fact that certification is conditional. When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper. See Payton v. Abbott Labs, 100 F.R.D. 336 (D.Mass.1983).
 
 
 101
 As the case goes forward, the district court may well find other important common issues, perhaps even more critical for resolution than those sorted out at this early stage. We are unwilling to foreclose that possibility. Nor do we limit the option of the district court to decertify if the issues it has classified as substantial later appear insufficient to justify the class procedure.
 
 
 102
 We acknowledge that our reluctance to vacate the (b)(3) certification is influenced by the highly unusual nature of asbestos litigation. The district court has demonstrated a willingness to attempt to cope with an unprecedented situation in a somewhat novel fashion, and we do not wish to foreclose an approach that might offer some possibility of improvement over the methods employed to date.
 
 
 103
 Accordingly, the order certifying a (b)(3) class will be affirmed as will the order denying a (b)(2) certification. The order granting a (b)(1)(B) class will be vacated.
 
 
 
 [1]
 Three school districts have filed related appeals challenging injunctions issued to enforce the mandatory class
 
 
 [2]
 See The Toxic Substance Control Act, 15 U.S.C. Sec. 2605 and E.P.A. regulations at 40 C.F.R. Sec. 763.78 et seq. For other legislative responses to asbestos in the schools, see 20 U.S.C. Sec. 3601 et seq.; 20 U.S.C. Sec. 4011 et seq
 
 
 [3]
 As an illustration, the same judge wrote about two cases in which each plaintiff had similar illnesses and symptoms: "In the case involving the man who most counsel thought to be the sicker of the two, the jury awarded $15,000. For the other plaintiff, the jury awarded $1,200,000. These results made this litigation more like roulette than jurisprudence." Rand Report at 42
 
 
 [4]
 Having found jurisdiction under Sec. 1292(b), we need not discuss whether Sec. 1292(a)(1) applies because of the injunctive orders issued in the related, consolidated cases. In any event, review under Sec. 1292(a)(1) is more restrictive. Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir.1982); Tustin v. Heckler, 749 F.2d 1055, 1065 (3d Cir.1984)
 
 
 [5]
 Counsel opposing interlocutory review admit that this court has the power to review the order in toto under our precedents. Nonetheless, they urge that we exercise discretion and confine our consideration to the precise legal question certified under Sec. 1292(b). Although review in these peculiar circumstances should be broad, we intend in no way to diminish the stature of Link v. Mercedes-Benz, Inc., 550 F.2d 860 (3d Cir.1977), as precedent in this court
 
 
 [6]
 Professor Owen published an article in 1976 generally approving punitive damages in the product liability context. Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257 (1976). Concerned by sky-rocketing awards in cases that followed, some six years later he wrote on the necessity of curbing abuses and restricting the grounds of eligibility for such awards. See 49 U.Chi.L.Rev. 1 (1982). Since the publication of the second article, verdicts have increased dramatically both in size and frequency
 
 
 [7]
 In four states, New Hampshire, Georgia, Michigan, and Connecticut, punitive damages have been allowed only to enhance the compensatory damages or to recover additional expenses, such as the cost of litigation. Ghiardi & Kircher, Punitive Damages Law and Practice, Sec. 4.02 et seq. (1984)
 
 
 [8]
 The situation here is somewhat analogous to the problem presented by an interpleader action in which all claimants to the fund have not been made parties. See Metropolitan Life Ins. Co. v. Dumpson, 194 F.Supp. 9 (S.D.N.Y.1961); see also Rapoport v. Banco Mexico Somex, 668 F.2d 667 (2d Cir.1982)
 
 
 [9]
 It was conceded by counsel at oral argument that resolution of the class members' punitive damage claims would be delayed pending resolution of the compensatory damage (class) claims, a likely delay of several years
 
 
 [10]
 We obviously do not reach the question whether the notion of under-inclusiveness applies outside of a 23(b)(1)(B) mandatory class action
 
 
 [11]
 One commentator has written:
 "there will be a point at which the sheer magnitude of the task of construing the various laws will compel a court not to certify the multistate class or to reduce it to a more manageable number of states. Even short of that point, choice of law may pose major problems. The first is the danger of an unwarranted intrusion into another state's legal affairs through a mistaken application of its laws. The court should thus consider its own familiarity with the other state's law, the degree to which that law is unclear or unsettled, and the extent to which it implicates important interests of the other state."
 Note, Multistate Plaintiff Class Actions: Jurisdiction and Certification, 92 Harv.L.Rev. 718, 742 (1979).