Edwin MALDONADO, and Maria Delores Maldonado, individually and as next friends of Ana Maldonado, Pablo Maldonado, Edwin Maldonado, Rey Maldonado, Yesenia Maldonado, and Jose Maldonado, and on behalf of all others similarly situated; Kensington Welfare Rights Union and Philadelphia Welfare Rights Organization, on behalf of themselves and their members; and Traveler's Aid Society of Philadelphia, individually and on behalf of its clients, Plaintiffs,

v.

Feather O. HOUSTOUN, Secretary of the Pennsylvania Department of Public Welfare, and Don Jose Stovall, Executive Director of the Philadelphia Board of Assistance, both in their official capacities, Defendants.

No. CIV.A. 97–4155.

United States District Court, E.D. Pennsylvania.

Oct. 6, 1997.

Mary A. McLaughlin, Anita L. Terry, Dechert, Price & Rhoads, Philadelphia, PA, Susan Frietsche, Women's Law Project, Philadelphia, PA, Rachel Nosowsky, Dechert, Price & Rhoads, Philadelphia, PA, for Maria Delores Maldonado and Edwin Maldonado.

Mary A. McLaughlin, Dechert, Price & Rhoads, Philadelphia, PA, Susan Frietsche, Women's Law Project, Philadelphia, PA, Rachel Nosowsky, Dechert, Price & Rhoads, Philadelphia, PA, for Kensington Welfare Rights Union and Philadelphia Welfare Rights Organization.

Mary A. McLaughlin, Rachel Nosowsky, Dechert, Price & Rhoads, Philadelphia, PA, for Traveler's Aid Society of Philadelphia.

Joel M. Ressler, Office of Attorney General, Harrisburg, PA, for Feather O. Houstoun and Don Jose Stovall.

Rachel Nosowsky, Dechert, Price & Rhoads, Philadelphia, PA, for Maria Ortiz and Michael Ortiz.

### *MEMORANDUM*

NEWCOMER, Judge.

Presently pending before this Court are plaintiffs' Motion for Class Certification, defendants' response thereto, and plaintiffs' reply thereto. For the following reasons, this Court grants plaintiffs' Motion.

Also before this Court are plaintiffs' Motion for a Preliminary Injunction, and defen-

dants' response thereto, and plaintiffs' reply thereto. A hearing was held on July 29, 1997, during which the parties offered evidence by way of oral and written testimony. For the following reasons, this Court grants plaintiffs' Motion.

## I. Introduction

Plaintiffs—Edwin and Maria Delores Maldonado, individually and next as friends of their children and on behalf of all others similarly situated, and a group of associations that represent their interests [1]—have brought this action to challenge the constitutionality of the "multi–tier" durational residency requirement contained in Section 9(5)(ii) of Act 35, codified at 62 P.S. § 432(5)(ii). Plaintiffs seek declaratory and injunctive relief on behalf of themselves and the class they represent, asserting that the multi–tier durational residency requirement in Section 9(5)(ii) of Act 35, on its face and as applied by the Pennsylvania Department of Public Welfare ("DPW") and the Philadelphia County Board of Assistance, is unreasonable and arbitrary, serves no legitimate government purpose, impermissibly penalizes, restricts, reduces, and/or limits plaintiffs' and class members' constitutional rights to travel and to equal protections and non-discrimina-

tory treatment, and violates 42 U.S.C. § 1983.

The defendants in this case are Feather O. Houstoun, the Secretary of the DPW, and Don Jose Stovall, the Executive Director of the Philadelphia County Board of Assistance. The DPW is the executive agency of the Commonwealth vested with responsibility for implementation of the multi–tier durational residency requirement. Stovall is purportedly charged with implementing the multi–tier durational residency requirement in Philadelphia as part of his duties to oversee DPW's cash assistance, food stamp, and medical assistance operations in Philadelphia. Both of these defendants are sued in their official capacities.

This entire action specifically arises out of defendants' implementation and enforcement of Section 9(5)(ii) of Act 35. Section 9(5)(ii) provides:

> Cash assistance for applicants and recipients of aid to families with dependent children who have resided in this Commonwealth for less than twelve months shall not exceed the lesser of the maximum assistance payment that would have been received from the applicant's or recipient's state of prior residence or the maximum

---

1. These associations are the Kensington Welfare Rights Union ("KWRU"), on behalf of themselves and their members, Philadelphia Welfare Rights Organization ("PWRO"), on behalf of themselves and their members, and Traveler's Aid Society of Philadelphia ("TASP"), individually and on behalf of its clients. These plaintiffs do not purport to represent any persons on a class–wide basis. KWRU is an unincorporated association of low-income people dedicated to ending poverty and homelessness. The members of KWRU are primarily single women who have received public assistance to provide their children with basic necessities. Some of KWRU's efforts are directed toward assisting families who recently moved to Pennsylvania, in some cases from Puerto Rico, to establish themselves in the community. KWRU claims that operation of the multi–tier durational residency will hurt KWRU's members depriving them of assistance necessary to provide for shelter, utilities, food, and other basic necessities.

PWRO is an unincorporated association of low-income people. Many of PWRO's members have lived outside the Commonwealth of Pennsylvania for some periods of their lives. Because of the challenged law, PWRO claims that its

members who arrived or returned here within the last year will be expected to live on wholly inadequate amount of assistance to provide for the basic necessities of life. PWRO contends that not only will the residency requirement result in direct harm to PWRO's membership, but it will sap resources from the organization's other efforts to reform the welfare system and help low-income people address their families' needs.

Plaintiff TASP is a non-profit corporation and the largest social service agency in the Commonwealth serving the needs of poor people migrating to this area, as well as those intending to leave Pennsylvania. TASP is the primary service provider to Philadelphia residents who have recently arrived in Philadelphia, including people who previously lived in the city but have been absent for six months or more, including financial assistance, to assist its clients in integrating into the local area or, where appropriate, to travel to where they have better access to resources. TASP contends that operation of the multi–tier durational residency requirement will strain TASP's resources, will impair the organization's ability to serve its clients, and will also injure its clients directly by depriving them of assistance they need to obtain food, shelter, and other basic necessities of life.

assistance payment available to the applicant or recipient in this Commonwealth. Act 35 (1996), § 9(5)(ii), codified at 62 P.S. § 432(5)(ii).[2]

In operation, this provision of Act 35 creates a multi–tier durational residency requirement—referred to as such because the law in effect creates a multitude of benefit levels for otherwise equally situated families. Under the operation of this statute, families who have been residents of Pennsylvania for more than one year receive all of the benefits they would be eligible for under the state plan. Families who have resided in Pennsylvania for less than one year are limited to the amount of cash assistance that they would have received had they remained in their previous state of residence. This means that if a family has moved to Pennsylvania from a state where they would receive cash assistance of only $300 per month, for the first year of their residence in Pennsylvania they can receive no more than $300 monthly in cash benefits, even if they would otherwise be eligible for hundreds more a month under the normal operation of the Commonwealth's welfare program. The multi–tiers arise because long-term residents of Pennsylvania—those with at least one year of residence—will receive a certain amount of benefits under Pennsylvania law; whereas, the short-term residents—those persons with less than one year of residency—will receive varying amounts depending on the law of their prior state of residence.

Section 9(5)(ii) is not a lone star in a galaxy of welfare legislation. Indeed, other states have enacted similar provisions. For example, California has enacted a provision which is strikingly similar to Pennsylvania's version.[3] Further, § 604(c) of The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"),[4] 42 U.S.C.

2. Act 35 was signed into law on May 16, 1996 when Governor Tom Ridge signed Senate Bill 1441. Although Act 35 was signed into law in May 1996, Section 9(5)(ii) of Act 35 was not implemented until March 1, 1997, when the DPW published a Notice of Rule Change in the Pennsylvania Bulletin to announce its implementation, effective the next business on March 3, 1997. Section 9(5)(ii) was not the only provision of Act 35 which limited the amount of welfare benefits that new residents of Pennsylvania could receive. Indeed, 62 P.S. § 432.4 imposed a one-year waiting period on the receipt of General Assistance cash benefits and 62 P.S. § 442.1(a)(1) denied Medical Assistance to bona fide residents who have lived in Pennsylvania for less than 90 days. These two provisions have never been enforced in Pennsylvania because the Attorney General of Pennsylvania issued a formal opinion directing the DPW not to enforce them, finding that both provisions were unconstitutional under existing Supreme Court precedent. The Attorney General never issued an opinion with respect to Section 9(5)(ii) because it had not been implemented at the time he issued his opinion.

3. The California statute provides:

Notwithstanding the maximum aid payments ...' families that have resided in this state for less than 12 months shall be paid an amount ... not to exceed the maximum aid payment that would have been received by that family from the state of prior residence.

Cal. Welf. & Inst.Code § 11450.03. It should be noted, however, that this statute was found to be unconstitutional. *Roe v. Anderson*, 966 F.Supp. 977 (E.D.Cal.1997) (enjoining enforcement of California's welfare statute).

4. As most persons are aware, the winds of change have swept over the welfare laws of our country over the past few years. For a number of reasons—which are legally–, politically–, socially–, economically–, morally–, and philosophically–based, the federal and state governments have embarked on a wide–scale reformation of this nation's welfare system. In this regard, the federal government, as well as most of the state governments, have recently enacted radical changes to the welfare laws that had been in place for decades.

Prior to 1996, there existed a program called Aid to Families with Dependent Children ("AFDC"), which was established as part of the Social Security Act of 1935. The AFDC developed as "an optional monetary supplement to individual state plans." Todd Zubler, *The Right to Migrate and Welfare Reform: Time for* Shapiro v. Thompson *to Take a Hike*, 31 VAL. U.L. REV. 893, 926 (1997). Under the AFDC, "the federal government allowed states to retain a one year waiting period for newcomers. The federal government also agreed to pay two-thirds of the program costs to encourage legislatures to increase benefits. This idea was that the more generous a state was with its own money, the more federal dollars that state would get." *Id.* Over the decades, the AFDC grew into a program that provided over $22 billion in benefits in 1993. *Id.* Although AFDC's expenditures grew over time, "the average real monthly benefit did not." *Id.* The federal government, in recent years, paid approximately fifty-five percent of the AFDC benefits. *Id.* However, the percentage varied from state-to-state. For example, the federal government provided seventy-eight percent of Mississippi's AFDC payments in 1995 as compared to only

§§ 601, *et seq.,* specifically authorizes states to treat interstate immigrants for one year under the welfare rules (including benefit amounts) of the states from which they moved.[5] Thus, plaintiffs, here, do not seek to enjoin a statute which is an anomaly in the current reformation process but rather plaintiffs seek to enjoin and have declared unconstitutional a statute which many states and the national government believe is central to their current reform efforts.

In this case, the named plaintiffs, Edwin Maldonado, his wife and six children, contend that the operation, implementation and enforcement of Section 9(5)(ii) unconstitutionally discriminates against them because it deprives them of welfare benefits that similarly situated residents of Pennsylvania would receive if they were in the Maldonados' position. In May 1997, the Maldonados moved to Pennsylvania from Guayama, Puerto Rico. The stated reason the family moved to Philadelphia was to receive medical care that would have not been available to them in Puerto Rico. Within seven days of arriving in Philadelphia, the Maldonados applied for welfare benefits.

Because of the operation of Section 9(5)(ii), the Maldonados receive only $304 per month in TANF benefits rather than the $836 per month that similarly situated families who have lived in Pennsylvania for the past twelve months receive. The difference represents a monthly loss of $532 per month, or 64 percent. Plaintiffs contend that Section 9(5)(ii) deprives them of basic subsistence-level payments because they cannot afford such basic necessities such as shelter, winter heat, clothing, and food on only $304 per month. Moreover, because Mr. and Mrs. Maldonado cannot currently work, they have no way to generate income.[6] The plaintiffs maintain that they cannot afford such basic necessities even though they receive other welfare benefits from Pennsylvania.

For example, the Maldonados receive approximately $720 worth of food stamps per month.[7] The Maldonados also receive medical benefits through the Keystone–Mercy HMO, for which the Commonwealth is being charged $1483.60 per month. The Maldonados also received two special allowances totaling $213, which could be used for Mrs. Maldonado's clothing for job interviews and transportation to prospective employers—interviews which the Commonwealth has determined should not occur until she undergoes and recovers from the eye surgery she needs to be employable. Because Mrs. Maldonado

---

fifty percent of New York's AFDC payments. Despite this injection of federal money, there existed great disparities in the amount of AFDC benefits paid in states.

For varying reasons, which are plainly beyond the scope of this opinion, Congress repealed the AFDC in 1996 when it enacted the PRWORA. This legislation abolishes the AFDC entitlement program and replaces it with block grants to the states. "Under the Temporary Assistance for Needy Families ("TANF") program, the federal contribution to a state's "family assistance program" is essentially fixed until 2002 at the level of the federal government's 1994 AFDC contribution to the state." *Id.* (citing 42 U.S.C.A. § 603(a)(1)). The states have to maintain their "overall welfare expenditures" at 80% or more of their 1994 levels. 42 U.S.C.A. § 609(a)(7). This legislation also requires states to encourage their recipients to work. Further, PRWORA limits all welfare recipients to only five years assistance for life, and requires states to have fifty percent of the welfare recipients either working or participating in some type of "work activity" by the year 2002. Zubler, *supra,* at 927 (citations omitted). In essence, these changes in the national welfare laws, including the one year waiting period, are designed to give the states

great latitude in deciding how to reform their welfare programs; the idea being that states, under a decentralized system, will be able to improve the welfare system by experimenting with different programs on the state and local level.

5. 42 U.S.C.A. § 604(c) (Supp.1997) provides:

A State operating a program funded under this part may apply to a family the rules (including benefit amounts) of the program funded under this part of another State if the family has moved to the State from the other State and has resided in the State for less than under 12 months.

6. The Commonwealth has determined that Mr. Maldonado is presently disabled and thus entitled to these benefits. In addition, the Commonwealth has determined that Mrs. Maldonado cannot work until she undergoes and recovers from eye surgery that needs to be done so she can work.

7. In addition, the Maldonados received $955 worth of food stamps for the initial benefit period of May 22 through June 30.

could not work, the Maldonados returned these allowances.

Despite these other benefits, the Maldonados contend that they will be unable to provide for life's basic necessities without a higher monthly cash assistance grant. Indeed, the Maldonados' monthly rent of $350 exceeds their monthly cash assistance, and they do not receive housing assistance. Further, the Maldonados have to pay for utilities such as gas, electricity and the phone. Once again, the Maldonados do not receive assistance for their utilities. The Maldonados also have to provide clothing for themselves and their six children, a cost which is only exacerbated by the fact that they came to Philadelphia from Puerto Rico where there was no need for winter clothing and now they must purchase it. In light of these observations, it is clear that the Maldonados face significant hardship in Pennsylvania due to the fact that they only receive $304 per month.

The Maldonados claim that the disparate treatment they receive by the operation of Section 9(5)(ii) is unconstitutional for three reasons. First, plaintiffs claim that the multi–tier durational residency requirement discriminates against new residents in violation of their fundamental right to travel. Plaintiffs contend that their fundamental right to interstate travel is implicated in this case because (1) Section 9(5)(ii) was enacted in part to deter interstate migration, (2) Section 9(5)(ii) actually deters interstate migration and (3) Section 9(5)(ii) penalizes the right to interstate migration. Because the right to interstate travel is implicated by Section 9(5)(ii), plaintiffs contend that Section 9(5)(ii) is subject to strict scrutiny. As such, plaintiffs argue that Section 9(5)(ii) is unconstitutional because it was enacted for an impermissible purpose and it is not narrowly tailored to serve a compelling government purpose.

Second, plaintiffs claim that Section 9(5)(ii) is unconstitutional because it violates the Equal Protection Clause. Plaintiffs argue that even under the rational review test, Section 9(5)(ii) must fail because no permissible rational purpose supports the distinctions created by the scheme between new resi-

dents and longer-term residents, or the distinctions among new residents who moved to Pennsylvania from different states with varied lower benefit levels. As such, the statute violates the Equal Protection Clause.

Finally, plaintiffs contend that Section 9(5)(ii) violates the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment because it unjustifiably discriminates against new bona fide residents by treating them as Tennesseans of Kentuckians or other out-of-staters, rather than as citizens of Pennsylvania and the United States.

At this stage of the litigation, plaintiffs move the Court to preliminarily enjoin the enforcement of Section 9(5)(ii) and any and all policies, rules and regulations promulgated by defendants to implement Act 35's multi–tier durational residency requirement. The plaintiffs claim that they are entitled to such relief because it is clear that there is a likelihood of success on the merits, they will be subject to irreparable harm in the absence of such an injunction, defendants will not be subject to irreparable harm if an injunction is granted, and the public interest will be furthered if an injunction is granted.

Plaintiffs also move this Court pursuant to Fed.R.Civ.P. 23(c) and Local Rule 23.1(c) for an Order certifying that this lawsuit may be maintained as a class action with the class defined as:

> All present and future AFDC or TANF applicants and recipients who have applied or will apply for AFDC or TANF since implementation of the multi–tier durational residency requirement began, and who have been, are being, or will be denied the Pennsylvania AFDC or TANF benefits they would receive if they had resided in Pennsylvania for at least twelve consecutive months immediately preceding their application for aid.

The Maldonados further move that they be certified as representatives of the class, and that their attorneys be appointed by the Court as class counsel. Plaintiffs argue that they satisfy the threshold requirements of

Rule 23(a) and the class requirement of Rule 23(b)(2).[8]

In opposition to plaintiffs, the defendants argue that plaintiffs are not entitled to either a preliminary injunction or class certification. With respect to the preliminary injunction, defendants argue that plaintiffs cannot demonstrate a likelihood of success on the merits, that plaintiffs will not be irreparably harmed, that the Commonwealth will be irreparably harmed, and that the public interest is furthered by this multi–tier durational residency requirement. With respect to the class certification motion, defendants argue that plaintiffs cannot satisfy the commonality, typicality and adequacy of representation requirements of Rule 23(a). Defendants also generally argue that a class should not be certified in this case because "it will not lead to efficiencies."

The Court will first consider plaintiffs' motion for class certification and then plaintiffs' motion for a preliminary injunction.

## II. Class Certification

■ Federal Rule of Civil Procedure 23(c)(1) provides that class certification shall be determined "as soon as practicable after the commencement" of the action. Fed. R.Civ.P. 23(c)(1). A determination of class certification does not focus on whether plaintiffs have stated a cause of action or will prevail on the merits but rather is limited exclusively to whether the requirements of Rule 23 have been satisfied. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 2153, 40 L.Ed.2d 732 (1974); *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 252 (3d Cir.1975); *Sala v. National R.R. Passenger Corp.,* 120 F.R.D. 494, 495 (E.D.Pa.1988). This determination is vested in the sound discretion of the trial court. *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 100, 101 S.Ct. 2193, 2202, 68 L.Ed.2d 693 (1981); *Jenkins v. Raymark Indus., Inc.,* 782 F.2d 468, 471–72 (5th Cir.1986). Since the court may amend an order granting class certification, *In re School Asbestos Litigation,* 789 F.2d 996, 1011 (3d Cir.1986), in a close case the court

should rule in favor of class certification. *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970).

To obtain class action certification, plaintiffs must establish that all four requisites of Rule 23(a) and at least one part of Rule 23(b) are met. *Wetzel,* 508 F.2d 239.

### A. Rule 23(a) Requirements

Rule 23(a) provides that:

> One or more members of the class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)(1)–(4).

The United States Court of Appeals for the Third Circuit has succinctly explained the purposes for which Rule 23(a) was created: "The requirements of Rule 23(a) are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." *Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994). The numerosity requirement addresses the concern of necessity, and the final three requisites are applied in order to determine "whether the class action can be maintained in a fair and efficient manner." *Id.*

#### 1. Numerosity

■ The district court can make a common sense determination whether it would be difficult or inconvenient to join all class members as named parties under the particular circumstances of a case. *See, e .g., Senter v. General Motors Corp.,* 532 F.2d 511, 523 (6th Cir.1976); *Peil v. National Semiconductor Corp.,* 86 F.R.D. 357, 365 (E.D.Pa.1980). The Third Circuit has held that joinder is impracticable even where the class is com-

**8.** Although plaintiffs contend in their Complaint that they also can satisfy the requirements of a Rule 23(b)(3) class, they only argue for certifica-tion of a 23(b)(2) class in their motion. Thus, the Court will only consider certification under Rule 23(b)(2).

posed of less than one hundred members. *See Weiss v. York Hosp.,* 745 F.2d 786, 808 (3d Cir.1984).

■ In this case, the numerosity requirement is clearly satisfied. Indeed, defendants do not contest numerosity. Defendants have admitted, at the TRO hearing, that the proposed class consists of more than two thousand families annually who have migrated or will migrate to Pennsylvania from states that provide lower cash assistance benefits through the TANF program. Records produced by defendants in response to plaintiffs' initial discovery request indicate that, within approximately the first four months of full implementation of the multi–tier durational residency requirement, roughly 730 Pennsylvania families have received lower cash assistance benefits because they moved to Pennsylvania from a state with lower benefits. Because the factual and legal issues relevant to their cases do not vary in any material way, joinder of all of their claims would be both inefficient and impracticable. Thus, the Court finds that the numerosity requirement has been satisfied.

### 2. Commonality

■ Before the Court determines whether plaintiffs have satisfied the commonality requirement, the Court must first address whether the standard for commonality has been modified by the Third Circuit's decision in *Georgine v. Amchem Products, Inc.,* 83 F.3d 610 (3d. Cir.), *aff'd,* — U.S. —, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

In *Georgine,* the Third Circuit recognized that some of its prior cases have "stated a very low threshold for commonality." *Id.* In *Baby Neal,* the Third Circuit stated that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Baby Neal,* 43 F.3d at 56. And, in *School Asbestos Litigation,* 789 F.2d at 1010, the Third Circuit stated that "the 'threshold of commonality is not high.'" (citation omitted). In *Georgine,* the Third Circuit noted that *Baby Neal* involved a class action for injunctive relief, thus raising fewer individualized questions, *Georgine,* 83 F.3d at 627, and *School Asbestos Litiga-*

*tion* upheld the certification of a national class "on the ground that the case involved only property damages." *Id.* (citation omitted). The Third Circuit, in contrast to these cases, held that "the commonality barrier is higher in a personal injury damages class action, like [*Georgine* ], that seeks to resolve all issues, including noncommon issues, of liability and damages." *Id.*

Hedging on this statement, however, the *Georgine* court qualified this standard of commonality by stating that it was not holding that "this class fails the commonality requirement because the test of commonality is subsumed by the predominance requirement, which this class cannot conceivably meet." *Id.* The *Georgine* court explained that it was proceeding "cautiously here because establishing a high threshold for commonality might have repercussions for class actions very different from this case . . . ." *Id.* It appears from these statements the Third Circuit was being ever so careful not to raise the threshold requirement of commonality in class actions except in the most extraordinary cases, such as *Georgine.*

In this case, the Court will not impose a higher threshold of commonality than the standard that was articulated in *Baby Neal.* Although this class action case possesses its own unique features, it is not *Georgine.* *Georgine* was a "personal injury damages class action," involving a settlement class, that was national in scope, where class members were being asked to compromise future claims without knowing what those claims might be. None of these factors are implicated by the facts in this case, thus the Court will not impose the higher threshold commonality requirement.

Under the *Baby Neal* standard, plaintiffs easily satisfy the commonality standard because there are many common questions of law and/or fact. Under *Baby Neal,* plaintiffs merely have to demonstrate that there is one common question of law or fact to satisfy the commonality requirement. Plaintiffs, in this case, have alleged the existence of numerous questions of fact and law, including, for example: whether the multi–tier durational residency requirement violates plaintiffs' and

proposed class members' fundamental right to travel and migrate interstate; whether it violates their right to equal protection under the Fourteenth Amendment of the United States Constitution; and whether it violates their rights under the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment. Based on the existence of these common questions, the Court finds that the commonality requirement is satisfied.

### 3. Typicality

■ The third requirement, "typicality", focuses upon whether the claims of the class representatives are "typical of the claims ... of the class." [9] The typicality requirement "is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees by requiring that the common claims are comparably central to the claims of the named plaintiffs as to the claims of the absentees." *Baby Neal*, 43 F.3d at 57. "Typicality entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" *Id.* (quoting *Hassine*, 846 F.2d at 177).

■ "The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *Georgine*, 83 F.3d at 631 (citing *Baby Neal*, 43 F.3d at 57). A plaintiff's claims are considered typical where, in light of the facts and law applicable to the case, litigation of the named plaintiff's personal claims can reasonably be expected to advance the interests of absent class members. *Scott v. University of Delaware*, 601 F.2d 76, 84 (3d Cir.1979). Additionally, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Grasty v. Amalgamated Clothing & Textile Workers Union*, 828 F.2d 123, 130 (3d Cir.1987); Herbert B. Newberg & Alba Conte, *1 Newberg on Class Actions*, § 3.15 (3d ed.1992).

■ In this case, the Court finds that the "typicality" requirement is also satisfied. The Maldonado's constitutional claims are shared by each of the prospective class members. By denying those families who recently have moved to Pennsylvania from states that provide a lower level of cash assistance the full level of benefits that longer-term Pennsylvanians receive, the named plaintiffs and the class members all have identical constitutional claims. Although the facts supporting each class member's claim will not be identical, as they never are, their claims arise out of a similar core of facts: that is, all are indigent bona fide Pennsylvania residents who have recently arrived in or returned to Pennsylvania from another jurisdiction that would have paid lower cash assistance benefits, and all are being denied a portion of subsistence benefits needed to provide for the basic necessities of life for the period of year. Thus, although the factual circumstances of each class member's claims will not be identical, the claims are not so "markedly different" that it can be said that the named plaintiffs' interests will perforce conflict with the interests of those of the class.

Indeed, the Third Circuit has held that "even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of the legal theories." *Baby Neal*, 43 F.3d at 58 (citing *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). In this case, there is a strong similarity between the legal theories being advanced by

---

9. "The concepts of commonality and typicality are broadly defined and tend to merge." *Baby Neal*, 43 F.3d at 56 (citation omitted). Both requirements attempt to "assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented." *Id.* (citing *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370 n. 13, 72 L.Ed.2d 740 (1982)). Despite this similarity, commonality and typicality serve two distinct functions. " 'Commonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff ...." *Hassine v. Jeffes*, 846 F.2d 169, 177 n. 4 (3d Cir.1988).

the named plaintiffs and the legal theories of the putative class members. Therefore the minor factual differences between each member of the putative class do not preclude a finding of typicality due to the fact that there is, at a minimum, "a strong similarity of legal theories."

Although defendants succeed in demonstrating that there exist some individualized questions which arise from the factual differences between the putative class members' individual claims, defendants fail to demonstrate that the "legal theories of the named plaintiffs potentially conflict with those of the absentees . . . ." *See Baby Neal,* 43 F.3d at 57. In other words, the Court concludes that "named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented." *See Georgine,* 83 F.3d at 631 (citing *Baby Neal,* 43 F.3d at 57).

### 4. Adequacy of Representation

■■■ Finally, Rule 23(a)(4) requires that plaintiffs must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Third Circuit has consistently relied on two factors:

> (a) the plaintiff's attorney must be qualified, experienced and generally able to conduct the proposed litigation; and (b) the Plaintiff must not have interests antagonistic to those of the class.

*Weiss,* 745 F.2d at 811 (quoting *Wetzel,* 508 F.2d at 247). In this case, both of these requirements have been satisfied; thus, plaintiffs have satisfied the requirements of adequacy of representation.

First, the attorneys who represent plaintiffs have extensive experience in complex litigation generally and in class actions in particular. There is no doubt that plaintiffs' attorneys are well-qualified to conduct the proposed litigation. Second, the plaintiffs do not have interests antagonistic to those of the class. Defendants argue in their brief that plaintiffs are not adequate representatives of the proposed class because their claims are not typical or common with those of the class. However, as discussed above, these claims are without merit.

Indeed, plaintiffs have already demonstrated the "ability and the incentive to represent the claims of the class vigorously." *See Hassine,* 846 F.2d at 179. Further, as noted above, there is no conflict between the Maldonados' claims and those asserted on behalf of the class. Therefore, the Court finds that plaintiffs have satisfied the adequacy requirement of Rule 23(a).

■■■ Having demonstrated that they satisfied the threshold requirements of Rule 23(a), plaintiffs must now establish that their proposed class meets the subsections of Rule 23(b). In this regard, plaintiffs argue that they have satisfied the requirements of Rule 23(b)(2).

### B. Rule 23(b)(2)

Rule 23(b)(2) provides that:

(b) **Class Actions Maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

\* \* \*

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Fed.R.Civ.P. 23(b)(2). The clear language of Rule 23(b)(2) thus dictates that a case may be maintained as a class action only if (1) the prerequisites of Rule 23(a) are satisfied and (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thus making appropriate final injunctive relief with respect to the class as a whole. The Third Circuit has stated that the requirements of Rule 23(b)(2) are "almost automatically satisfied in actions primarily seeking injunctive relief." *Baby Neal,* 43 F.3d at 58 (observing that a 23(b)(2) class "serves most frequently as the vehicle for civil rights actions and other institutional reform that receive class action treatment").

By implementing and enforcing the multitier durational residency requirement and refusing to cease implementation and enforcement in light of plaintiffs' claims, both defen-

dants have acted and refused to act on grounds generally applicable to the class. In addition, plaintiffs seek broad declaratory and injunctive relief against the defendants. Thus, this action falls squarely within the requirements of Rule 23(b)(2).

Because plaintiffs have sustained their burden of satisfying the prerequisites of Fed. R.Civ.P. 23(a) and the requirements of Rule 23(b)(2), this action will be certified as a class action. The Court now turns to plaintiffs' request for a preliminary injunction.

## III. Preliminary Injunction

In ruling on a motion for a preliminary injunction, the trial court must consider: (1) the likelihood that the plaintiff will prevail on the merits at final hearing; (2) the extent to which the plaintiff is being irreparably harmed by the conduct complained of; (3) the extent to which the defendant will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *Merchant & Evans, Inc. v. Roosevelt Bldg. Products, Co.*, 963 F.2d 628, 632–33 (3d Cir. 1992). "The injunction should issue only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *Id.* at 633.

### A. Likelihood of Success on the Merits

The Court must begin its analysis by considering the likelihood that plaintiffs will prevail on the merits of their claims. In order to properly reach this determination, however, the Court must first set forth and explain the law that must be applied in this case.

### 1. The Applicable Law

As an initial matter, the Court notes that there is no constitutional right to public welfare assistance, and therefore a constitutional challenge to classifications created by a state's welfare statute, standing alone, is subject to rational basis review. *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1160–61, 25 L.Ed.2d 491 (1970). However, in this case, plaintiffs do not assert a constitutional right to TANF benefits; instead, they challenge the statute as violative of their constitutional right to travel,[10] their constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, and their constitutional rights under the Privileges and Immunities Clauses of Article IV and the Fourteenth Amendment. Although each and every one of plaintiffs' counts are based on violations of different provisions of the United States Constitution, all of plaintiffs' claims arise out of the modern "right to travel" jurisprudence; an area of jurisprudence that is unsettled and clearly in need of clarification by the United States Supreme Court.[11] However, this Court cannot await a clarifying decision by the Supreme Court but rather this Court must attempt to apply this fractured area of law to the facts of this case.

**10.** The Supreme Court has yet to pinpoint the textual basis for this right. *See Lutz v. City of York*, 899 F.2d 255, 260 (3d Cir.1990) (citing no less than seven different constitutional provisions suggested by various Justices as the source of the right to travel).

**11.** Many scholars have criticized the Supreme Court's right to travel jurisprudence, articulating many reasons as to why this area of jurisprudence is highly suspect, and indeed, advancing many cogent reasons as to why *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the leading case in this area, should be overruled or at least substantially modified. *See, e.g.*, Thomas R. McCoy, *Recent Equal Protection Decisions–Fundamental Right to Travel or "Newcomers" as a Suspect Class?*, 28 VAND. L. REV. 987 (1975); Zubler, *supra* (citing numerous legal scholars who have argued that the Supreme Court should clarify its "right to travel" jurisprudence). Indeed, some Supreme Court Justices have claimed that *Shapiro* was wrongly decided, most notably the late Justice Harlan in

dissent in *Shapiro*. Many scholars criticize the *Shapiro* Court for issuing a decision that was an exercise in judicial policymaking rather than textual interpretation of the Constitution. Further, many scholars claim that the right to travel jurisprudence is unsettled and fractured because the *Shapiro* Court failed to base the right to travel on a specific textual provision of the Constitution. *See, e.g.*, Zubler, *supra*, at 896–98, 910 (citations omitted). This Court would tend to agree with this proposition. The Supreme Court's failure to ground the right to travel in a particular provision of the Constitution has led to an unreasoned application of this doctrine because the lower federal courts must apply this right to travel jurisprudence without fully considering the purposes behind the right to travel within its proper textual context. Being an inferior federal court, however, this Court must attempt to fairly apply this unsettled area of law to facts of the case before it.

In a line of cases beginning with *Shapiro*, the Supreme Court has considered whether state durational residency requirements implicated the right to travel and interstate migration to such an extent so as to require the application of the compelling state interest test.[12] In *Shapiro*, the Court found unconstitutional provisions denying welfare assistance to residents who had not resided for at least one year within the jurisdiction of the particular state in which the applicant had applied for benefits.[13] The Court found that such provisions discriminate invidiously by "creat[ing] two classes of needy resident families indistinguishable from each other expect that one is composed of residents who have resided a year or more, and the second of residents who have resided less than a year, in the jurisdiction." *Id.* at 627, 89 S.Ct. at 1327. The Court found that "any classification which serves to penalize the exercise of that right [to travel] unless shown to promote a compelling state interest, is unconstitutional." *Id.* at 634, 89 S.Ct. at 1331. The Court could not find any compelling purposes behind the statutes in *Shapiro*.

The Court rejected the justification that such a waiting period would deter migration of poor people into the state; such a justification was directly at odds with the constitutional right of migration. *Id.* at 629, 89 S.Ct. at 1328–29. Nor was it relevant whether those migrating to the state in fact were seeking higher assistance payments or came for other reasons; the Court found that a state had no more a right to deter those from settling in search of greater welfare assistance than it would to deter those seeking better educational opportunities. *Id.* at 631–32, 89 S.Ct. at 1329–30. The Court also rejected any justification of the measure based on past tax contributions; this "reasoning would logically permit the State to bar new residents from schools, parks, and libraries or deprive them of police and fire protection." Such an apportionment of state services would violate equal protections. *Id.* at 632, 89 S.Ct. at 1330. Finally, the Court held that the states' legitimate concern for its fiscal integrity could not justify discrimination against new residents for the "saving of welfare costs cannot justify another invidious classification." *Id.* at 633, 89 S.Ct. at 1330.[14]

12. It is noted that the Supreme Court, in *Shapiro*, made no distinction between the right to travel and the right to interstate migration, despite the fact that these two rights are not identical. For example, a person may have the right to travel in and through a country; however, this very same person may not have the right to migrate, that is, establish a permanent residence in that country. *See* Zubler, *supra*, at 896. The *Shapiro* Court, as well as many other courts, did not attempt to distinguish between these two separate and distinct rights, nor did the Court attempt to ground these rights in any particular textual provision of the Constitution. Many scholars opine that this failure to distinguish between these rights has resulted in much doctrinal uncertainty in this area of jurisprudence. Nonetheless, because the Supreme Court has treated these rights coextensively, this Court must do the same.

13. In *Shapiro*, plaintiffs challenged the enforcement of three separate welfare laws. One group of plaintiffs challenged a Connecticut statute that had barred them from receiving AFDC benefits because they had not resided in the state for one year or more. Another group of plaintiffs challenged a Pennsylvania statute that had barred them from receiving AFDC benefits solely because they had not been residents of Pennsylvania for a year prior to their applications. The final group of plaintiffs challenged a District of Columbia Code provision that had precluded

them from receiving AFDC benefits because they had not resided in the District of Columbia for one year immediately preceding the filing of their applications. All of the statutes that were eventually found to be unconstitutional in *Shapiro* are strikingly similar to the statute being challenged herein.

14. The *Shapiro* Court, after it declared the right to travel "fundamental," took a peculiar turn in its logic when it applied equal protection analysis instead of applying substantive due process analysis. Zubler, *supra*, at 896. Indeed, it appears that the next step should have been substantive due process analysis. *Id.* at 897 (citing *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)). In *Sherbert*, the Court had struck down a state unemployment program that denied benefits to workers who would not work on Saturdays. "*Sherbert* was one of the first 'unconstitutional conditions' cases, recognizing that the modern welfare state had more ways to deter the exercise of constitutional rights than just using fines and imprisonment." *Id.* In *Sherbert*, the Court held that "denying benefits to those whose practice their religion by not working on Saturdays would impose 'the same kind of burden upon the free exercise of religion as would a fine imposed' for Saturday worship." *Id.* (citing *Sherbert*, 374 U.S. at 404, 83 S.Ct. at 1794). It was this substantive due process analysis that was manifestly at work in *Shapiro*'s

The Supreme Court refined the *Shapiro* analysis in two subsequent decisions. In *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), the Supreme Court invalidated an Arizona provision requiring a year's residence in a county as a condition of receiving nonemergency medical care at county expense. The Court posed the issue as whether the state's classification "penalized" persons who had recently migrated to the state. *Id.* at 256–57, 94 S.Ct. at 1081–82. If there were such a penalty the provision would be unconstitutional unless supported by a compelling state interest. *Id.* at 262–63, 94 S.Ct. at 1084–85. The Court found that just as the denial of the necessities in life in *Shapiro* operated to penalize recent migrants so did the denial of nonemergency medical care. The Court rejected the state's argument that since some medical services—emergency services—were provided without waiting, the denial of nonemergency medical services could be distinguished from the complete denial as in *Shapiro*. *Id.* at 259–61, 94 S.Ct. at 1082–84. Moreover, the Court, once again, rejected the argument that the state's interest in protecting its financial stability was of a sufficiently compelling nature. *Id.* at 263, 94 S.Ct. at 1084–85.

In *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the Court, relying on *Shapiro*, invalidated a durational residency provision requiring one-year's residence before a new resident could vote. However, *Dunn* did more than just apply *Shapiro*, it made some important clarifications of the right to migrate jurisprudence. First, the Court broadened *Shapiro* by rejecting any notion that *Shapiro* was limited to cases where there was either an intent to deter migration or actual deterrence. The Court stated that strict scrutiny applies to any classification that serves to penalize that right to travel regardless of legislative intent or actual deterrence.[15] *Id.* at 340–41, 92 S.Ct. at 1002–03. The second clarification in *Dunn* was that Justice Marshall attempted to limit the reach of *Shapiro*. Justice Marshall explained that a durational residency requirement would not penalize one's right to travel where the statute was not applied to that person solely based on that person's recent arrival in that state. *Id.* at 342 & n. 12, 92 S.Ct. at 1003 & n. 12.

In sum, *Shapiro* and its progeny establish that a state law implicates the fundamental right to travel and therefore triggers strict scrutiny: (1) when impeding interstate travel is its primary purpose; (2) when its uses a classification which serves to penalize the right to travel; or (3) where it actually deters such travel. *Attorney General of New York*

reasoning because the Court cited *Sherbert*. *Shapiro*, 394 U.S. at 634, 89 S.Ct. at 1331. However, the Court did not cite *Sherbert* for its substantive due process analysis, rather it cited *Sherbert* for its equal protection analysis. *Id.*

The Court probably used equal protection analysis because it realized how difficult it would have been to limit its due process analysis. *See* Zubler, *supra*, at 897–98 (explaining why the deprivation of welfare benefit cases are not the normal "penalty" cases and why courts would have difficulty limiting the reach of substantive due process analysis in any case in which welfare benefits had been modified by the state). Despite the Court's attempt to limit the implications of a substantive due process analysis by instead grounding its reasoning in *Shapiro* upon the Equal Protection Clause, the courts find themselves stuck with the same overbreadth problem under Equal Protection analysis because courts are required to determine whether the classifications that a welfare statute create are a "penalty" on the right to travel. The *Shapiro* Court held that any classification that "touches on the fundamental right of interstate movement" is sub-

ject to strict scrutiny. *Shapiro*, 394 U.S. at 638, 89 S.Ct. at 1333. However, almost any "state decision regarding welfare benefits could 'touch on' the right to migrate and thus trigger strict scrutiny." *Id.* at 900. Thus, under the *Shapiro* Court's penalty analysis, almost any statute which is found to effect interstate migration could be found to be unconstitutional despite the fact that the statute may not actually interfere with this right. As Justice Harlan stated in his dissent in *Shapiro*, the fundamental rights strand of equal protection "creates an exception which threatens to swallow the standard equal protection rule." *Shapiro*, 394 U.S. at 661, 89 S.Ct. at 1345 (Harlan, J., dissenting).

**15.** Some commentators have criticized the Court for separating the idea of penalty from deterrence. *See* Zubler, *supra*, at 901. Indeed, it has been suggested that "if the validity of a classification depends on the importance of lost benefits rather than the classification's deterrent effect, 'what is being protected is not the right to travel, but the right to the withheld benefit.' " *Id.* (citing The Supreme Court—1973 Term—Leading Cases, 88 HARV. L. REV. 43, 117–18 (1974)).

*v. Soto–Lopez*, 476 U.S. 898, 903, 106 S.Ct. 2317, 2321, 90 L.Ed.2d 899 (1986) (plurality opinion). Before determining whether there is a likelihood that plaintiffs will succeed on the merits, the Court must further explore the Supreme Court's right to travel jurisprudence because the Supreme Court has appeared to subtly move away from *Shapiro*'s fundamental rights analysis. Indeed, no majority of the Court has used *Shapiro*'s strict scrutiny since *Maricopa*,[16] and the Court has moved towards something of a rational review test in right to migrate cases.

The Court first backed off *Shapiro*'s holding in *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In this case, the Court upheld the state's one year residency requirement for petitioners seeking a divorce decree when the petitioner is not a state resident for at least one year. The Court found two factors that distinguished *Sosna* from *Shapiro*, *Dunn* and *Maricopa*. First, the Court noted that the state's interests in regulating domestic relations and protecting its divorce decrees from collateral attack was materially greater than the budgetary and recordkeeping interests advanced in prior cases. Second, the Court found that the delay in divorce did not "irretrievably foreclose[ ]" persons from eventually obtaining a divorce. The test the Court applied in this case was an ad hoc balancing test and should probably best be viewed as *sui generis*. Zubler, *supra*, at 905.

After *Sosna*, a more noticeable trend in case law appeared in the case of *Zobel v. Williams*, 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982). In *Zobel*, the Court invalidated an Alaska statute providing payments from oil revenues to all residents where the size of the payment was determined by years of residency.[17] The Court found that such a measure could not even survive the minimum rationality test. The Court warned that an approach that divided residents by years of residency threatened inequality over a large field, whereby residents would be entitled to government services and benefits based on length of residency. *Id.* at 64, 102 S.Ct. at 2314–15. In this opinion, Chief Justice Burger, writing for the Court, made no mention of penalties and wrote in a footnote that the "right to travel analysis refers to little more than a particular application of equal protection analysis." *Id.* at 60 n. 6, 102 S.Ct. at 2313 n. 6. He further emphasized that "[r]ight to travel cases have examined, in equal protection terms, state distinctions between newcomers and longer term residents." *Id.* This language clearly indicates the Court's desire to shift the analysis in right to migrate cases away from the fundamental right/penalty analysis. Indeed, the Court noted that there was no need to determine whether enhanced scrutiny should apply because the Alaska statute failed the minimal rationality test.

However, the minimum rationality test that was applied by the *Zobel* Court ap-

**16.** In *Soto–Lopez*, only the plurality opinion written by Justice Brennan applied *Shapiro*'s fundamental rights analysis. The other five Justices flatly refused to apply *Shapiro*'s analysis. In their brief, plaintiffs argue that three Justices, in the dissent written by Justice O'Connor, agreed with the utility of *Shapiro*. Justice O'Connor's dissent directly contradicts plaintiffs' position. Although Justice O'Connor recognized that the plurality applied *Shapiro*'s enhanced scrutiny, Justice O'Connor explicitly stated that "heightened scrutiny, either under the 'right to migrate' or the Equal Protection Clause ... is inappropriate" in the case at bar. *Soto–Lopez*, 476 U.S. at 924, 106 S.Ct. at 2332 (O'Connor, J., dissenting). Indeed, Justice O'Connor implicitly attacked *Shapiro*'s penalty analysis when she stated that regardless of the Constitutional provision that is used to attack a statute, "something more than the minimal effect on the right to travel or migrate that exists in this case must be required to trigger heightened scrutiny or the plurality's

right to travel analysis will swallow all the traditional deference shown to state economic and social regulation." *Id.* at 925, 106 S.Ct. at 2333. Justice O'Connor seemed to be echoing those same concerns as to the overbreadth of *Shapiro* that Justice Harlan first expressed in his dissent in *Shapiro* nearly thirty years ago.

**17.** In *Zobel*, the statute in question basically provided that each person 18 years old or older receives one dividend unit for each year of residency subsequent to 1959, the first year of statehood. Based on this statute alone, a clear distinction can be noticed between *Zobel* and *Shapiro* and its progeny, that is, *Zobel* was a case that dealt with a fixed residency requirement that treated each year as a different group; whereas, the *Shapiro* cases only dealt with two groups—residents for one year or more and residents for less than one year.

peared to be an "enhanced" rational basis review. Zubler, *supra*, at 905. Indeed, Professor Lawrence Tribe has argued that the Court's enhanced review appears "more the result of dissatisfaction with existing tools of equal protection analysis for dealing with [discrimination against newcomers] than of any overall shift in the Court's scrutiny of how well various purposes fit legislatively chosen means." *Id.* at 905–906 (citing Lawrence H. Tribe, AMERICAN CONSTITUTIONAL LAW § 16–2 (2d ed.1988)). Thus, the Court appears to have established a different test, in the framework of Equal Protection, to use in deciding right to travel cases. The Court has created a rational basis review that has more punch then the typical rational review test.

This "enhanced" rational basis review was actually applied by the Court again in the case of *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985). In *Hooper*, the state provided a tax exemption for Vietnam Veterans residing in the state prior to May 8, 1976. The Court, applying *Zobel*'s rational review basis, invalidated the preference because it was based on a impermissible purpose—the state's desire to reward its "own" residents based on their "past contributions" to the state. *Id.* at 622–23, 105 S.Ct. at 2868–69. Citing *Zobel*, the Court noted that residents may not be discriminated against solely on the basis of the date of their arrival in the state. *Id.* at 623, 105 S.Ct. at 2868–69. Thus, *Hooper* continued the Court's trend away from applying enhanced strict scrutiny in right to travel cases.

In 1986, the Supreme Court decided the *Soto–Lopez* case, which only caused more confusion with the right to migrate jurisprudence. In this case, the Supreme Court struck down a civil service employment pref-

erence for veterans who had lived in New York when they entered the service.[18] Although the Court had only recently applied the *Zobel* test in *Hooper*, the Court was unable to produce a majority opinion. The plurality opinion, authored by Brennan, used *Shapiro*'s penalty analysis to invoke strict scrutiny to strike down the state's preference program favoring longer-term residents. Chief Justice Burger and Justice White concurred, but only on the grounds that New York's program failed *Zobel*'s minimal rationality test. Justice O'Connor, Rehnquist and Stevens disagreed, arguing that New York's program passed equal protection rational basis and that the program's minimal effect on interstate migration was insufficient to invoke the higher scrutiny of the Comity Clause, on which these justices now grounded the right to migrate. Thus, this Court is left with the task of applying this splintered jurisprudence to the facts of this case to determine whether Section 9(5)(ii) passes constitutional muster. However, before the Court applies this law, it must describe Justice O'Connor's Comity Clause test in more detail because the plaintiffs here advance this same Comity Clause [19] argument.

In *Zobel*, Justice O'Connor suggested that the right to migrate should be based in Article IV's "Privileges and Immunities" Clause, and her dissenting opinion in *Soto–Lopez* gained the votes of both then-Justice Rehnquist and Justice Stevens. Justice O'Connor in *Zobel* found that the right to migrate was based in the text of the Comity Clause of Article IV, holding that this provision of "the Constitution supplies the relevant basis for analysis in evaluating claims ..., where the principal allegation is that the state scheme impermissibly distinguishes between state residents, allegedly imposing a relative bur-

---

**18.** The statute at issue in *Soto–Lopez* granted a civil service employment preference, in the form of points added to examination scores, to New York residents who were honorably discharged veterans of the United States Armed Forces, who served during time of war, and who were residents of New York when they entered military service. *Soto–Lopez*, thus, is a case where the statute created fixed, permanent distinctions between residents based on when they arrived in the state. Thus, it can be distinguished from the *Shapiro* cases on this ground. *Shapiro* and its

progeny are cases that deal with distinctions between all long-term residents and all newcomers; whereas, *Soto–Lopez* was a case that dealt with not only *Shapiro* type distinctions but also distinctions between long-term residents.

**19.** The Comity Clause guarantees that the "Citizens of each state shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. Art. IV, § 2.

den on those who have more recently exercised their right to establish residence in the State." *Soto–Lopez*, 476 U.S. at 920, 106 S.Ct. at 2330 (citing *Zobel*, 457 U.S. at 74–75, 102 S.Ct. at 2320–21 (O'Connor, J., concurring opinion)). Under this Comity Clause analysis, the constitutionality of a durational residency requirement would depend in part on whether non-citizens "constitute a peculiar source of the evil at which the statute is aimed." *Zobel*, 457 U.S. at 76, 102 S.Ct. at 2321. If the Court did find that the non-citizen constituted the peculiar source of evil, the statute would be found unconstitutional if there was no " 'substantial relationship' between the evil and the discrimination practiced against the noncitizens." *Id.* Thus, Justice O'Connor, through her concurrence in *Zobel* and dissent in *Soto–Lopez*, has added another wrinkle to the Supreme Court's right to migrate jurisprudence, which this Court must attempt to apply to this case.

### 2. The Law Applied

Whatever the current state of the Supreme Court's right to migrate jurisprudence, the Court must apply the *Shapiro* analysis to the case at bar because it is still binding precedent on this Court due to the fact that it has never been overruled and its facts are similar to this case.

▮ Under *Shapiro* and its progeny, a state law implicates the fundamental right to travel and therefore triggers strict scrutiny: (1) "when impeding [interstate] travel is its primary objective"; (2) "when it actually deters such travel"; or (3) "when its uses any classification which serves to penalize the right to travel." *Soto–Lopez*, 476 U.S. at 903, 106 S.Ct. at 2321 (citations and internal quotations omitted). Plaintiffs argue that

strict scrutiny should be applied to review Section 9(5)(ii) because the multi–tier durational residency requirement exhibits all three of these features. Notwithstanding plaintiffs' argument, the Court finds that in light of the record before it, plaintiffs have not established that any of these features are present.

First, plaintiffs have not established that the "primary objective" of Section 9(5)(ii) is to inhibit interstate migration. Defendants argue that Section 9(5)(ii) furthers two governmental objectives: (1) the distinctions created by the multi–tier durational residency requirement will encourage work and self-sufficiency and (2) Section 9(5)(ii) will prevent Pennsylvania from becoming a "welfare magnet," thus ensuring the financial stability of Pennsylvania's welfare program. Plaintiffs surely cannot claim that Pennsylvania's objective to encourage its residents to work and become self-sufficient would support a finding that the primary objective of Section 9(5)(ii) is to inhibit interstate migration. Indeed, the *Shapiro* Court has held that the purported goal of encouraging employment is an "admittedly permissible state objective[]." *Shapiro*, 394 U.S. at 634, 89 S.Ct. at 1331. Thus, in order to support their "primary objective" argument, plaintiffs must look to the other purpose advanced by defendants.

As stated above, defendants candidly admit that Section 9(5)(ii) was enacted to prevent Pennsylvania from becoming a welfare magnet. In general terms, the welfare magnet theory "postulates that poor people are induced to move to states which pay relatively higher welfare benefits because they want to take advantage of those benefits."[20] (Hartman Decl. ¶ 5). When defendants state that Section 9(5)(ii) was enacted to prevent

---

20. At the preliminary hearing, Professor John Hartman, an Assistant Professor of Sociology at Columbia University, testified that there simply exists no statistical evidence that would support the welfare magnet theory. These findings were based on statistical studies that he and a colleague had conducted over a two-year period. Based on these studies, Professor Hartman reached the conclusions that poor migrants are not more likely to move to states with higher benefits than states with lower welfare benefits; poor migrants are not more likely to receive AFDC than long-term residents; relatively high welfare benefits levels do not hold poor people in place; and relatively high welfare benefits do not encourage the receipt of benefits. Professor Hartman also strongly criticized seven other large scale attempts to measure the magnetic effect of welfare benefits. In his opinion, "each of the studies [are] flawed in some meaningful way, and none of the studies truly test[] the proposition that poor women of childbearing age are likely to move from states that pay low AFDC benefits to states with higher AFDC benefits." (Hartman Decl. ¶ 8)

Pennsylvania from becoming a welfare magnet, what defendants are in essence saying is that Pennsylvania enacted Section 9(5)(ii), at least in part, to discourage poor migrants from coming to Pennsylvania to take advantage of its welfare benefits. This finding is necessarily so because the only way Pennsylvania can achieve its goal of not becoming a welfare magnet is if poor migrants do not come to Pennsylvania, that is what Section 9(5)(ii) was intended to do in part.

The Supreme Court has repeatedly stated that a law enacted for the purpose of inhibiting migration into state is virtually unconstitutional. *See Hooper,* 472 U.S. at 620 n. 9, 105 S.Ct. at 2866 n. 9; *Zobel,* 457 U.S. at 62 n. 9, 102 S.Ct. at 2314 n. 9; *Maricopa,* 415 U.S. at 263–64, 94 S.Ct. at 1084–85; *Shapiro,* 394 U.S. at 629, 89 S.Ct. at 1328–29. Indeed, the Supreme Court has held that "the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible." "If a law has 'no other purpose than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it [is] patently unconstitutional.'" *Shapiro,* 394 U.S. at 631, 89 S.Ct. at 1329 (citation omitted).

 Applying this law, this Court can draw two conclusions about the welfare magnet purpose advanced by the Commonwealth. First, the purpose of preventing the Commonwealth from becoming a welfare magnet is constitutionally impermissible. *See id.* at 629, 89 S.Ct. at 1328–29. The Commonwealth simply cannot attempt to discourage poor persons from migrating to the Common-

wealth in order to prevent the state from becoming a welfare magnet; the law is clear on this point. Moreover, the Commonwealth cannot purify this impermissible purpose with the assertion that the money saved by discriminating against newly-arrived TANF recipients will provide Pennsylvania with resources to direct additional assistance to longer-term residents. *Id.* at 633, 89 S.Ct. at 1330–31. Indeed, the Supreme Court has stated that while "a State has a valid interest in preserving the fiscal integrity of its programs," the "State may not accomplish such a purpose by invidious distinctions between classes of its citizens." *Id.* The *Shapiro* Court concluded by holding that states "must do more than show that denying welfare benefits to new residents saves money. The saving of welfare costs cannot justify an otherwise invidious classification." *Id.* Applying this precedent, it is obvious that Pennsylvania's purpose of preventing it from becoming a welfare magnet is constitutionally impermissible.[21]

 The second conclusion that this Court reaches, however, is that strict scrutiny should only be applied if the "primary objective" of Section 9(5)(ii) is to deter migration. *Soto–Lopez,* 476 U.S. at 903, 106 S.Ct. at 2321. Thus, the question posed to this Court is whether the "primary objective" of Section 9(5)(ii) is the impermissible purpose of deterrence or the permissible purpose of encouraging work and self-sufficiency. Plaintiffs, citing Section 9(5)(ii)'s legislative history,[22] official statements the

---

21. Although this result may seem counter–intuitive on an economic level, this result is mandated by the Supreme Court's constitutional law.

22. Plaintiffs first direct this Court's attention to evidence disclosing the Commonwealth's longstanding alleged animus toward impoverished migrants. However, this alleged evidence is irrelevant to this case because it is not the legislative history to Section 9(5)(ii), but rather is the legislative history to prior statutes and even bills that were never enacted into law. With respect to Section 9(5)(ii), plaintiffs quote statements made by two state representatives that allegedly reflect the legislative history of Section 9(5)(ii). One of these statements was made by Representative Charles Dent during debate on the bill that became Act 35. Rep. Dent stated that Pennsylvania will "welcome" only those who come to the

Commonwealth "for a life, not for a subsidy[.]" House Leg. J. at 925–96. And Rep. Pat Browne stated that individuals who move to Pennsylvania for benefits are "individuals who are here to cherry-pick and here to shop for our benefits." House Leg. J. at 935 (May 15, 1996). These statements are hardly overwhelming evidence that Pennsylvania passed Section 9(5)(ii) with the primary purpose of deterring migration. Indeed, these statements were made by only two state representatives and were made during a debate over Act 35, not specifically Section 9(5)(ii). Based just on these two statements, any court would be hard-pressed to conclude that the legislative intent behind the enactment of Section 9(5)(ii) was to deter migration.

Plaintiffs also rely on statements that were contained in a platform when Governor Ridge was campaigning for the governorship in 1994.

DPW has made to the federal government in implementing the multi-tier benefits scheme,[23] and statements made by defendants in their briefing, argue that the primary objective of this statute is to deter migration. In contrast, defendants contend that the primary purpose behind the enactment of Section 9(5)(ii) is to encourage work and self-sufficiency. In support of this position, defendants cite to Section 401 of Act 35 which sets forth the legislative intent for the enactment of Act 35: "It is hereby declared to be the legislative intent to promote the self-sufficiency of all the people of the Commonwealth." It is rare that a Court is provided with such a clear statement of the legislative intent behind a statute.

After considering the purposes that Section 9(5)(ii) was enacted for, the Court concludes that plaintiffs cannot establish that the "primary objective" behind the enactment of Section 9(5)(ii) was to deter migration. The snippets of legislative history and the statement from the DPW do not convince this Court that the primary objective behind the enactment of Section 9(5)(ii) was to deter migration in light of the clear legislative intent of Act 35, which is to encourage self-sufficiency and work. While the Court recognizes that one of the purposes behind Section 9(5)(ii) was to discourage an influx of poor migrants into Pennsylvania, the Court simply cannot find that this was Pennsylvania's primary objective in enacting Section 9(5)(ii). Thus, strict scrutiny will not be applied based on the "primary objective" of the statute.

> However, statements made by a candidate for governor simply cannot be considered legislative history for a statute that was enacted nearly two years later. It is one thing for Governor Ridge's supporters to hold him accountable for the promises he made in his platform for governor; it is an entirely different proposition to raise the promises he made in his platform to legislative history.

**23.** The DPW applied to the federal government for a waiver of AFDC requirements that, until the passage of PRWORA, would have precluded enforcement of the multi-tier durational residency requirement. In that application, DPW stated:

> We request a waiver to limit the AFDC grant for applicants and recipients during the first 12 months of residency in this State. The grant

Plaintiffs also fail to prove that Section 9(5)(ii) actually deters migration. The only evidence that plaintiffs offer in support of their actual deterrence argument is not evidence at all but rather a statement made by the *Shapiro* Court. In *Shapiro*, the Court held that state laws requiring indigent families to wait a year before receiving subsistence level benefits are "well-suited to discourage the influx of poor families in need of assistance." *Shapiro*, 394 U.S. at 629, 89 S.Ct. at 1328. The plaintiffs here, just like the plaintiffs in *Shapiro*, simply offer no empirical evidence that Section 9(5)(ii) will discourage migration. This Court simply cannot rely on speculation and conjecture in deciding whether a statute is potentially unconstitutional. In addition, the little evidence which has been offered indicates that there is no actual deterrence. Indeed, plaintiffs' own witness, Professor Hartman, concluded that poor migrants do not move based on welfare benefits, *i.e.*, welfare benefits simply are not a consideration when poor migrants decide to move. Thus, the Court finds that plaintiffs cannot establish that Section 9(5)(ii) actually deters migration.[24]

■ Finally, the Court finds that plaintiffs cannot demonstrate that Section 9(5)(ii)'s durational residency requirement results in a "penalty" on the right to interstate migration. To begin, the Supreme Court has made it clear that not every durational residency requirement rises to the level of a penalty and that the parameters of the *Shapiro* penalty analysis are undefined:

> shall not exceed the lesser of the maximum assistance received in the prior state or the maximum available in Pennsylvania. Current policy does not require a national payment standard, and the payment amounts vary widely from state to state. *We must ensure that Pennsylvania resources are available to Pennsylvania residents.*

Demonstration Project 1115 Waiver Application at IV–10 (emphasis added).

**24.** The Court notes that the *Shapiro* Court merely surmised that the statute in question therein would actually deter migration; its conclusion was not based on empirical evidence. This Court, however, cannot rest its finding on conjecture because the Supreme Court's decisions require this Court to determine if the durational residency requirement actually deters migration.

Although any durational residency requirement impinges to some extent on the right to travel, the Court in *Shapiro* did not declare such a requirement to be *per se* unconstitutional. The Court's holding was conditioned, 394 U.S. at 638 n. 21, 89 S.Ct. at 1333 n. 21, by the caveat that some "waiting period or residence requirements ... may not be penalties upon the exercise of the constitutional right to interstate travel." The amount of impact required to give rise to the compelling-state interest test was not made clear.

*Maricopa*, 415 U.S. at 256–57, 94 S.Ct. at 1081–82. Thus, the question here is whether the durational residency requirement that limits cash benefits to the level of the state of prior residence but that allows qualified new residents access to food stamps, clothing for job interviews, medical assistance, emergency assistance, and job transportation rises to the level of a *penalty* on the right to interstate migration that would trigger strict scrutiny analysis. *See Warrick v. Houstoun*, Civil Action No. 94–1634, at 16 (W.D.Pa. Aug. 30.1996). This Court concludes that it does not.

Relying on *Shapiro* and its progeny, plaintiffs argue that Section 9(5)(ii) penalizes plaintiffs and class members by limiting TANF benefits to the level of plaintiffs' and the class members' prior state of residence because it deprives them of basic necessities of life. The Court, however, first finds several distinctions between the statutes at issue in *Shapiro* and its progeny and the durational residency requirement at issue here. In *Shapiro*, the statute at question therein deprived the newcomers of all benefits necessary for basic sustenance and health, including food, shelter and medical care, a complete denial that would last for a year. The deprivation in *Shapiro*, thus, clearly imposed a penalty on the newcomers because it essentially deprived them of life's basic necessities.

In this case, the newcomers to Pennsylvania are not being deprived of the things that are necessary for their very survival, since the plaintiffs and class members are eligible to receive TANF cash assistance benefits, albeit, at a reduced level, food stamps, clothing for job interviews, medical assistance, and job training and transportation, in addition to receiving assistance in finding employment, without regard to any durational residency requirement. Indeed, this case is distinguishable from *Shapiro* because *Shapiro* addressed a statute which caused a complete deprivation of life's basic necessities. For example, the newcomers in *Shapiro* received no cash assistance. In this case, the newcomers receive TANF cash assistance at the same level that they would have received in their state of prior residence. The plaintiffs also receive food stamps ($720 per month) and medical benefits ($1483.60 per month), and are eligible to receive the state's assistance in finding employment. These facts militate against a finding that the multi-tier durational residency requirement imposes a penalty on the plaintiffs' right to interstate migration.

This conclusion is bolstered by the fact that the lower benefits provided do not make new residents any worse off because the new residents receive exactly what they were receiving or would have received in their state of prior residence. Thus, the "penalty" that plaintiffs allege is imposed on them for exercising their right to migrate interstate is not a "penalty" in the traditional sense of the word—a lost benefit that the person would have received had he not exercised some constitutional right. *Zubler, supra,* at 897. Indeed, the plaintiffs here have lost no benefit that they would have received had they not exercised their right to migrate.[25] Thus, given the fact that new migrants are provided the means of obtaining what is necessary for their basic sustenance and health, combined with the fact that the Supreme Court has subtly moved away from applying the

---

25. This entire discussion with respect to whether or not the Maldonados were penalized for exercising their right to migrate highlights the difficulty that courts have in applying the *Shapiro* Court's penalty analysis to a case where there is not a penalty in the traditional sense of the word. In fact, the "penalty" that is allegedly imposed in these cases is a mere legal fiction. Indeed, in the Court's more recent cases, the Court appears to have tended to subtly shift the analysis away from the penalty aspect of *Shapiro* because of the inherent difficulty in applying this analysis in cases where there exists no penalty in the traditional sense.

penalty analysis in cases where there has been no penalty in the traditional sense, the Court finds that Section 9(5)(ii)'s multi–tier durational residency does not act as a penalty on plaintiffs' right to interstate migration.

[19] Because the durational residency requirement of Section 9(5)(ii) dose not operate as a penalty on an individual's right to interstate migration, strict scrutiny is not appropriate. Thus, Section 9(5)(ii) need only be rationally related to a legitimate government purpose to survive the constitutional challenge mounted in the present case.

As stated above, the Commonwealth offers as its legitimate government objectives: (1) "discouraging persons from shopping around for the 'best benefit package of the year' " (2) an intent to encourage employment, self-respect and self-dependency among its welfare recipients, that is to encourage self-reliance over reliance on welfare. The first purpose, of course, is an unconstitutionally impermissible purpose. *See Shapiro*, 394 U.S. at 629, 89 S.Ct. at 1328–29. The Supreme Court has explicitly stated that "the purpose of inhibiting migration by needy persons into the State is constitutionally impermissible." *Id.* The defendants admit that Section 9(5)(ii) was enacted in part to discourage welfare recipients from shopping around for benefits and to prevent an "influx of indigent people from other states." Because the first purpose is not valid, the Court must turn to the second purpose offered in support of Section 9(5)(ii). This purpose, unlike the first purpose, is clearly a legitimate government objective. The Supreme Court has stated that encouraging work is an "admittedly permissible state objective[]." *Id.* at 634, 89 S.Ct. at 1331. Thus, the next question to be answered is whether Section 9(5)(ii) is rationally related to a legitimate government purpose.

Although the Supreme Court has stated that encouraging employment is a legitimate government purpose, the Court has also expressly held that a one-year waiting period that is justified as a means of encouraging new residents to seek and obtain employment sooner "provides *no rational basis* for imposing a one-year waiting period restriction on new residents only." *Id.* at 637–38, 89 S.Ct. at 1333. Thus, under binding Supreme Court precedent, Section 9(5)(ii)'s one year waiting period simply cannot be justified by claiming that it encourages newcomers to work because it simply is not rationally related to this purpose. Indeed, a close review of how Section 9(5)(ii) would operate indicates that Section 9(5)(ii) must fail because of its inherent irrationality.

To begin, if the goal of the multi–tier durational residency requirement is to promote self–sufficiency, for example by encouraging work, "this logic would also require a similar waiting period for long–term residents of this State." *Id.* at 637, 89 S.Ct. at 1333. In addition, defendants' justification depends on the wholly unsubstantiated assumptions that newcomers to Pennsylvania are somehow less motivated than more established TANF recipients to seek work and that, when they apply for cash assistance, the members of the latter group but not the former have exhausted any alternatives the Commonwealth has to offer.

Moreover, the complete irrationality of Section 9(5)(ii) is exposed when the Court compares the amount of benefits that similarly situated groups of newcomers will receive. The Commonwealth has enacted Section 9(5)(ii) for the purpose of encouraging work; the assumption being that if the newcomers receive less money, then they will have a greater incentive to join the work force. Thus, one would expect that Section 9(5)(ii), in operation, would limit the benefits that all newcomers receive because the purpose is to encourage all newcomers to work. Section 9(5)(ii), however, fails miserably to achieve this purpose.

Indeed, Section (5)(ii) and its rules and regulations provide for multiple benefit levels for identically situated newcomers. For example, if you had two families, identically situated, arriving in Pennsylvania on the same day, establishing a residence in Pennsylvania and then applying for TANF benefits, but one of the families was from California and one was from Puerto Rico, the family

from California[26] would receive the same benefits that a long-term family would receive, and the family from Puerto Rico would receive the limited benefits. At the present time, approximately twenty states have welfare benefits higher then Pennsylvania's benefits; newcomers that come from any of these twenty states would automatically receive the full amount of Pennsylvania TANF cash assistance. In addition, but more surprisingly, the residency requirement appears not to apply to poor migrants from other countries. Hence, new state residents from one of the United States that pays lower benefits will receive less cash assistance than new residents from foreign countries. From these observations, it is manifest that Section 9(5)(ii) is anything but rationally related to achieving its purpose of encouraging newcomers to work. Indeed, large groups of newcomers would automatically receive full benefits upon first arriving in Pennsylvania. This result underscores the irrationality of Section 9(5)(ii).

■ Because plaintiffs cannot demonstrate that Section 9(5)(ii) is rationally related to its espoused governmental purpose, it appears that Section 9(5)(ii) violates the Equal Protection Clause of the Fourteenth Amendment. Thus, plaintiffs have established a likelihood of success on the merits.[27]

### B. Irreparable Harm to Plaintiffs

■ As this Court held in its Order dated June 25, 1997, in which the Court denied plaintiffs' request for a temporary restraining order, the plaintiffs have demonstrated that they will suffer irreparable harm in the absence of a preliminary injunction. Plaintiffs can demonstrate irreparable harm based on the sole fact that they will be deprived of their constitutional right to the equal protection of law in the absence of an injunction. *Olmeda v. Schneider,* 889 F.Supp. 228, 231–32 (D.V.I.1995).

■ In addition to the deprivation of their right to equal protections, plaintiffs will be irreparably harmed due to the loss of much of their cash assistance benefits. In *Caulk v. Beal,* 447 F.Supp. 44 (E.D.Pa.1977) (Newcomer, J.), this Court recognized the enormity of the harm that the loss of cash assistance benefits visits on low–income persons. Other courts have also recognized that a reduction in subsistence benefits constitutes irreparable harm to persons on the "margin of subsistence." *Philadelphia Welfare Rights Org. v. O'Bannon,* 525 F.Supp. 1055, 1058–60 (E.D.Pa.1981); *see also Hill v. O'Bannon,* 554 F.Supp. 190 (E.D.Pa.1982). In *PWRO v. O'Bannon,* the court held that the plaintiffs would face irreparable harm if they lost food stamps benefits averaging two or three dollars per month. In addition, in *Mayhew v.. Cohen,* 604 F.Supp. 850 (E.D.Pa. 1984), the court found that irreparable and substantial harm existed when poor families were deprived of 10 percent of their welfare checks. *Id.* at 859.

In this case, even if the Maldonados were to receive the full TANF benefits, they would be living at only 37 percent of the poverty line according to official poverty guidelines published by the Department of Health and Human Services.[28] A reduction of their TANF benefits, due to the operation of Sec-

---

**26.** Because California provides more generous benefits to TANF recipients than Pennsylvania does, those people who move from California to Pennsylvania and apply for benefits in Pennsylvania receive the same amount that longer-term Pennsylvania residents receive. 62 P.S. § 432(5)(ii).

**27.** With respect to plaintiffs' Privileges and Immunities Clause argument, the Court finds that plaintiffs would be hard-pressed to establish a violation of this constitutional provision. First, Justice O'Connor's Comity Clause argument has never been adopted by a majority of the Court. Indeed, the majority opinion in *Zobel* did not support the position advanced by Justice O'Connor. Second, and more importantly, Justice

·O'Connor's argument cannot find support in Article IV's Comity Clause. As stated by then-Justice Rehnquist, this "Clause assures nonresidents of a State shall enjoy the same privileges and immunities as residents enjoy.... We long ago held that the Clause has no application to a citizen of the State whose laws are complained of." *Zobel,* 457 U.S. at 84 n. 3, 102 S.Ct. at 2325 n. 3 (citations omitted) (Rehnquist, J., dissenting). Thus, in this case, when the Maldonados became citizens of Pennsylvania, they lost the protection that the Comity Clause of Article IV affords.

**28.** *See* Annual Update of the HHS Poverty Guidelines, 62 Fed.Reg. 10856 (Mar. 10, 1997).

tion 9(5)(ii), constitutes irreparable harm because they already live on the margin of subsistence. Although the Maldonados as yet have not been pushed into homelessness or rendered unable to feed themselves or their children, Edwin Maldonado testified that he had not yet received his utility bills for which he will receive no assistance in paying. Adding these bills to their monthly rent, and the fact that Mr. Maldonado still has to buy winter clothing for his six children, it becomes clear that the Maldonados will be unable to pay for the basic necessities of life due to the operation of Section 9(5)(ii). Moreover, Edwin and Maria Maldonado are both presently unable to work according to the Commonwealth's own determinations, thus the Maldonados will be unable to earn money to make up for the obvious shortfall in income. Under these circumstances, it is clear that the Maldonados will suffer irreparable harm in the absence of a injunction.

### C. Irreparable Harm to Defendants

█ The only argument defendants make to support their contention that a preliminary injunction will irreparably harm the Commonwealth is a fiscal one. They allege that if an injunction is granted but the Commonwealth ultimately prevails, it is highly unlikely that the Commonwealth will be able to recover its overpayment of cash assistance. But the Commonwealth's desire to save money is not a legitimate basis for discriminating against newly-arrived residents in the distribution of welfare benefits. *See Shapiro*, 394 U.S. at 633, 89 S.Ct. at 1330–31. Accordingly, the Commonwealth cannot claim a legally cognizable injury.

In addition, defendants do not discuss why the Commonwealth could not recover overpayment through future grant reductions or through other debt collection processes. *See, e.g., Turner v. McMahon*, 830 F.2d 1003 (9th Cir.1987) (upholding federal statute permitting recoupment of funds expended pursuant to a preliminary injunction), *cert. denied*, 488 U.S. 818, 109 S.Ct. 59, 102 L.Ed.2d 37 (1988). Based on these reasons, the Court finds that defendants have failed to establish that they will experience irreparable harm if the injunction is granted.

### D. The Public Interest

█ First, it is clearly in the public interest to ensure that all bona fide Pennsylvania residents receive temporary assistance when they are unable to adequately provide for their families and themselves. Second, it is also in the public interest to ensure that Pennsylvanians are not driven into the streets or forced to go without food, shelter or heat due to an unconstitutional statute.

Finally, the defendants have failed to point to any countervailing public interest that would counsel against granting the requested injunctive relief. Indeed, defendants cannot plausibly argue that the multi–tier durational residency requirement advances the public interest because it violates the Equal Protection Clause of the United States Constitution as articulated by the Supreme Court's right to migrate jurisprudence. With this said, the Court finds that the public interest will be furthered by the granting of the preliminary injunction requested herein.

### IV. Conclusion

Accordingly, for the foregoing reasons, the Court will grant plaintiffs' motion for class certification. The Court will also grant plaintiffs' motion for a preliminary injunction, it appearing that plaintiffs have a reasonable probability of eventual success on the merits, plaintiffs will sustain immediate and irreparable injury unless a preliminary injunction is issued, greater injury would result by refusing the injunction than by granting such relief, and the public interest would be promoted by the grant of preliminary relief.

Although the Court determines that Section 9(5)(ii) of Act 35 fails to pass constitutional muster under binding Supreme Court precedent, today's decision should not be taken to mean, in any fashion, that the actions of legislature of the Commonwealth of Pennsylvania were undertaken for nefarious purposes. Under our Nation's current welfare laws—which are highly decentralized in the hope that experimentation at the state level will lead to an improvement in these laws, and thus free an untold number of people from their dependency on welfare, durational residency requirements may be needed, and

indeed even required, to prevent what has been called the race to the bottom. Without these durational residency requirements, the only option left to a well-intentioned legislature, if it believes that the welfare magnet is correct, is to lower benefits. Thus, the Commonwealth's decision to enact Section 9(5)(ii) cannot be found to have been unreasonable or ill-intentioned, indeed, this Court finds to the contrary. Instead, Section 9(5)(ii) is unconstitutional under binding Supreme Court precedent because it fails to rationally advance the legitimate governmental purposes that underlie it.

AND IT IS SO ORDERED.

## ORDER

AND NOW, this 6th day of October, 1997, upon consideration of Plaintiffs' Motion for Class Certification, and defendants' response thereto, and plaintiffs' reply thereto, it is hereby ORDERED that:

1. The Motion for Class Certification is GRANTED and the following class is CERTIFIED pursuant to Fed.R.Civ.P. 23(b)(2) & (c):

> All present and future AFDC or TANF applicants and recipients who have applied or will apply for AFDC or TANF since implementation of the multi–tier durational residency requirement began, and who have been, are being, or will be denied the Pennsylvania AFDC or TANF benefits they would receive if they had resided in Pennsylvania for at least twelve consecutive months immediately preceding their application for aid.

2. Plaintiffs Edwin and Maria Delores Maldonado individually and on behalf of their children, are designated representatives of the class; and

3. Dechert Price & Rhoads, the Woman's Law Project, Community Legal Services, Seth Kreimer, and the American Civil Liberties Union are appointed as class counsel.

Upon consideration of Plaintiffs' Motion for a Preliminary Injunction, and defendants' response thereto, and plaintiffs' reply thereto, and the testimony of the witnesses, the admitted exhibits and the arguments of counsel, and consistent with the foregoing memorandum of law, it is hereby ORDERED that:

1. Plaintiffs' Motion for a Preliminary Injunction is GRANTED;

2. Defendants are hereby preliminarily enjoined from enforcing 62 P.S. § 432(5)(ii) and any and all regulations, rules, and policies they have promulgated to implement Act 35's multi–tier durational residency requirement until final disposition of this litigation or as this Court shall otherwise order;

3. Defendants shall, within ten (10) days of the entry of this Order, adjust the TANF cash assistance levels of all plaintiffs and class members to the levels they would now be receiving if not for implementation of the multi–tier durational residency requirement, effective with the current monthly payment period, without requiring plaintiffs or class members to take any further action;

4. Defendants shall, within ten (10) days of the entry of this Order, transmit mutually agreed-upon notice of this injunction to a list mutually agreeable to all parties of social agencies and advocacy organizations who serve new residents to the Commonwealth, including homeless shelters and shelters and agencies serving abused women and children;

5. The Department of Public Welfare shall, as quickly as possible but in any event within three (3) days of the entry of this Order, inform all County Assistance Offices of the terms of this preliminary injunction; both defendants shall, as quickly as possible but in any event within three (3) days of the entry of this Order, inform all of their agents and employees of the terms of this preliminary injunction; and

6. In accordance with the provisions of Federal Rule of Civil Procedure 65(c), plaintiffs are ordered to post nominal security in the amount of one dollar ($1.00).

AND IT IS SO ORDERED.